Submitted on record and briefs February 28, sentence vacated; remanded for resentencing; otherwise affirmed September 13, 2006, petition for review denied January 23, 2007 (342 Or 299)

# STATE OF OREGON,
*Respondent,*

*v.*

# CLYDE ERWIN TAYLOR,
*Appellant.*

## 0110-36994; A119911

142 P3d 1093

David E. Groom filed the opening brief for appellant. Clyde Erwin Taylor filed the supplemental brief *pro se*.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Laura S. Anderson, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Edmonds and Rosenblum, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendant appeals from a conviction for Assault II. He makes four assignments of error in his brief prepared by counsel. Defendant also makes an assignment of error *pro se*. After considering the assignments of error, we affirm defendant's conviction but remand for resentencing.

Defendant first assigns error to the trial court's denial of his motion for substitution of counsel, arguing that the court erred in requiring him to proceed to trial without appointing substitute counsel to represent him at trial. Defendant made his motion to substitute counsel on the day set for trial. Previously, defendant had been tried on the same charge, but that trial ended in mistrial because the jury was unable to agree on a verdict. Defendant was to be represented by the same attorney, appointed at public expense, in the second trial. The attorney told the court that he was prepared to proceed with trial but that defendant wanted him to withdraw. The following discussion, which we quote at length, occurred.

"[DEFENDANT'S ATTORNEY]:   He filed a bar complaint against me in June, June 12th. I responded to that. It was a simple bar complaint. I felt it raised a conflictual [*sic*] issue for me and [defendant]. In fact, before Judge Frankel's settlement conference, I said, I'm your lawyer. Do you want me to represent you at this, in this process at this hearing, and he said that's fine. We talked about that.

"Judge Frankel came in and said, We are going to have a settlement conference. Would you like to try to settle this case and [defendant's attorney] is going to be here with you and continue to represent you, so that was fine at that point. He told me last week on my last phone call just before the phone was unfortunately disconnected again that he wanted me to renew the motion with Judge Frantz, so that I called Judge Frantz's office and I talked with the clerk and she looked up the rule.

"I believe that was Donna. And Donna said, Well, it's a gray area under the rule because although Judge Frantz had ruled on this exact same issue with the exact previous lawyer and exact previous lawyer before that with bar complaints that she felt that Judge Frantz would not handle

that because she had already heard the original case to remove me.

"Now, I can't—I'm not going to get into the specifics of [defendant's] bar complaint because, of course, that's in the—yet an open record. Although all those records are open, I don't think it's yet an open record in my file. I don't think it's in that file.

"So I explained to him before the phone was disconnected that he would need to bring his own oral statement into the record before the court so that the court could consider whether or not there's an actual conflict.

"I know that [defendant] filed the original motion—excuse me, bar complaint in June. I responded. He then complained about me. I didn't respond to that because it raised ethical issues. It was more a personality complaint and now he's filed another one, and I think that hit the bar last week and I haven't responded to that one.

"It was essentially a reiteration of the previous complaint. Nothing [new] had come about from that. [Defendant] has told me that he believes that once he files a bar complaint that I have to get off his case.

"* * * * *

"So I didn't mean to bring this so late to the court. I actually wanted to get in front of Judge Frantz last week but that couldn't happen because of her schedule so [defendant], I think, has to approach the court with his motion to relieve me at this point because I cannot find any grounds to ask the court to withdraw me.

"THE COURT:   Okay. [Defendant]?

"THE DEFENDANT:   Yes. The first reason why I wanted him off my case is because when he—when they assigned him to my case, they had already had a custody, 60-day custody extension for substitution of attorneys. That was the third one. The statute says they can only have two. You got the fourth one, which was illegal. How they got a custody extension I don't know. The statute says two. He gets four. You deny me due process of the law and you violate my constitutional rights. He had no right getting two custody extensions because it's against the law. They had a custody extension.

"THE COURT: [Defendant], he needed to prepare your case. You wanted witnesses—

"THE DEFENDANT: He didn't have to leave me in jail.

"THE COURT: The options—[defendant], usually the options are, you know, you don't get three or four court-appointed attorneys. Just doesn't happen that way. So the alternative would have been to just say I'm sorry, you've had two attorneys. We're not going to appoint the third attorney for you and if you don't agree to have this extension, then your attorney is not going to be able to prepare for trial. We won't be able to find a lawyer for you.

"THE DEFENDANT: Gave him time to prepare.

"THE COURT: Okay. So what other objections do you have?

"THE DEFENDANT: That's the number one. And number two, I got a civil rights lawsuit complaint against him. That's another reason why I don't want him on my case.

"THE COURT: Okay.

"THE DEFENDANT: And number three, he got a block on his phone. It's been three months since my first trial. I can't contact him. He don't call me. Unless he call me for—called me twice two weeks ago. I ain't talked to him but three times in three months. He didn't work on my case. None.

"The last time I went to trial, I told him to get me three of my witnesses. He told me he couldn't find but one of my witnesses. That's why they impose the 30-day sentence is to get my witnesses. He has done nothing on my case, nothing.

"THE COURT: Well, he got a pretty good result at the last trial, didn't he?

"THE DEFENDANT: Excuse me?

"THE COURT: He got a pretty good result.

"THE DEFENDANT: No, no, I don't think so, no.

"THE COURT: You don't think so?

"THE DEFENDANT: No.

"THE COURT: Okay. Any other objections that you have?

"THE DEFENDANT: No, that's it.

"THE COURT:    All right. Now—

"[DEFENDANT'S ATTORNEY]:    Judge, could I—

"THE COURT:    Sure.

"[DEFENDANT'S ATTORNEY]:    —put on the record what happened there[?] I think that if the court looks—from the time I was appointed, I had less than 40 days to go to trial, 30 days. Judge Frantz, I think, called me off the bench. I mean, she was on the—she was—called me on the bench and said could I take it and quick set it into my calendar and I looked and I could.

"And we had multiple conversations both personally and on the phone and at one point [defendant] told me that, yes, he would agree to an extension. So I came back out to the Inverness jail with a 60-day extension and he said no way, he wasn't going to do that, and actually told counsel for the state that that was okay.

"And then she wasn't frustrated with me personally; however, she was very frustrated with the profession level because I had told her he was waiving 60 days and then he wouldn't sign.

"In terms of the witnesses, it's very clear that one witness, Mr. Sims, James Sims, is not available. Can't find him. I spent four hours looking for him all over the place and the bottom line was, he was never a relevant witness. He's got nothing to say.

"And then the other witness is in the Oregon State Penitentiary for Women, and she's available. The problem is that all she would talk about in terms of this case was that she thought that the victim in this case was the more violent person.

"We already have a witness that's testified to that and that becomes cumulative and she's not even talking about the stabbing, as the court remembers, 21 days before this incident that would rise to [defendant's] self-defense.

"So as an officer of the court and as an attorney, I don't call witnesses that don't have relevant information and will be objected to and sustained at trial.

"THE COURT:    The law doesn't require you to call every person that a defendant wants called—

"[DEFENDANT'S ATTORNEY]:   Thank you.

"THE COURT:   —to the trial. What the law requires is you to do your work as an attorney and make your decision about whether or not you're going to present the case in a particular way.

"[Defendant] is not legally trained, and as I've seen in the past, lawyer—people who are trying to represent themselves, they make a—very generally make very bad decisions about what they should do. And so, you know, I think that the reason that [defendant] has an attorney representing him is that it's the attorney experience that knows what may or may not work in the trial.

"And as long as you're following up on whatever requests there are, you can make the trial strategy decision and you can't be faulted for making trial strategy decisions.

"But, [defendant], the problem is we are on the morning —this is the morning of trial and the case is going to go forward to trial. So the question is—

"THE DEFENDANT:   I don't want him. I don't want him to represent me.

"THE COURT:   You don't want [defendant's attorney] to represent you?

"THE DEFENDANT:   No.

"THE COURT:   You're going to be representing yourself?

"THE DEFENDANT:   I guess so. I don't want him to.

"THE COURT:   Well, there are no other options.

"THE DEFENDANT:   You're not going to give me another attorney, right?

"THE COURT:   There are no options this morning.

"THE DEFENDANT:   Well—

"THE COURT:   The case is ready to go to trial.

"THE DEFENDANT:   Why did he wait right to my trial date to tell me this, right on my trial date and I told him two months ago.

"THE COURT:   Well, he attempted to schedule it before—

"THE DEFENDANT: He didn't attempt to do nothing. He's lying, talking about I signed a waiver. I ain't signed a waiver in my life. Why should I sign one?

"THE COURT: Well, at this point, [defendant], it doesn't matter all that much, you know, because you have been convicted of one of the charges. There is a presentence report. I can go forward with the sentencing right now.

"THE DEFENDANT: I can understand that, Your Honor.

"THE COURT: So, you know, it's sort of a moot issue. What you need to think about right now is forget about the 60-day issues or problems and all of that. You have to think about the trial.

"THE DEFENDANT: Forget it? That's my rights. It's constitutional. What do you mean forget about it?

"THE COURT: Forget at the moment. You can deal with these issues some other time. You're not going to be getting out today so the question is, do you want to go forward to trial with an attorney that has tried this case, that had done a really good job for you, or do you want to just go forward on your own? I mean, that's the decision.

"THE DEFENDANT: So you're going to make me take him, right?

"THE COURT: I'm not making you do anything.

"THE DEFENDANT: But you're not going to give me another attorney?

"THE COURT: You can't have another attorney at this point.

"THE DEFENDANT: So that I got to take him, right?

"THE COURT: Today is the day of trial. You can make your own decisions about how you want to go forth.

"THE DEFENDANT: I want another attorney.

"THE COURT: You can't have another attorney.

"THE DEFENDANT: Make me take him, right.

"THE COURT: There is no attorney that will try the case today. There is no attorney that will take your case and try it today. Just simply isn't, because they've got to prepare. So do you want to—

"THE DEFENDANT:   I did my work on my case.

"THE COURT:   [Defendant], you need to calm down a little bit, okay.

"THE DEFENDANT:   —the day of my trial to get another attorney. You telling me to calm down.

"THE COURT:   Right, right.

"THE DEFENDANT:   I told him three months ago to get me another attorney.

"THE COURT:   I'm telling you to calm down because you are in the courtroom and you have to behave. [Defendant]—

"THE DEFENDANT:   —trial with an attorney I got a bar complaint against.

"THE COURT:   [Defendant], you have to let me finish what I'm saying, okay. You need to calm down because you are in the courtroom and you are addressing the court. Now, you may scream and yell whatever you want to scream and yell, but you do not do that to me, so you have to calm down.

"Do you want to spend some time talking to [defendant's attorney] about the next step?

"THE DEFENDANT:   Yeah.

"THE COURT:   All right. The other thing that I can do is because I am the trial judge, it may not be such a good idea for me to tell you about the consequences of whatever decisions you might be making, and I'm suggesting that you might want to talk to another judge. If you called another judge, talk to another judge about what your options are at this point.

"And you're aware that there was a presentence report that was submitted and [defendant's attorney] has told you about the recommendation of that.

"THE DEFENDANT:   He ain't told me nothing.

"THE COURT:   So you don't know about the presentence investigation?

"THE DEFENDANT:   He sent it to me. He ain't talked to me about it.

"DEFENDANT'S ATTORNEY: Judge, that has been mailed to him. I called—

"THE DEFENDANT: He—

"[DEFENDANT'S ATTORNEY]: I called him and I asked him specifically did he receive it, did he read it. He indicated he had, and I asked him if he understood the numbers and he was vague about that. I said, well, we need to discuss those. He said an expletive and the phone amazingly went dead.

"THE COURT: The bottom line is that the presentence report is recommending four years; is that correct?

"* * * * *

"THE DEFENDANT: I ask you something, Your Honor? On that presentence investigation, right, they took a misdemeanor and turned it into a felony and then up to double jeopardy. How do they do that?

"THE COURT: That's the recommendation. It's allowed under the law.

"THE DEFENDANT: Why does the state—It's allowed?

"THE COURT: Well, we'll show, if you—you would like, [defendant's attorney] would show that information, but in any event, that is the recommendation at the moment.

"THE DEFENDANT: Yeah.

"THE COURT: And then whatever it is that you're facing in this case. Why don't I have you talk to a judge and—

"THE DEFENDANT: Okay.

"THE COURT: —then we can sort things out. But you need to understand that the witnesses are here, we're [sic] been waiting for the trial date, [defendant], you've been waiting for this trial date as you're telling me, and so we need to go forward if things don't work out.

"THE DEFENDANT: Okay. Your Honor, he did no work on my case, though, none. None. I told him that I wanted some work did. He haven't did anything, nothing.

"THE COURT: Well, right now what you're going to be talking about is the various consequences of what can happen to you with a judge, and then we'll take it from there. We'll figure out what's going to happen.

"But, you know, regardless of what you think, [defendant's attorney] did a very good job at your trial because I watched that trial and I was there and watched the attorneys perform. He did a good job for you in a hung jury. You need to understand that a hung jury on this—on this felony was a pretty good result. Given that the jury found you guilty of the other charge, that was a good result.

"So anyway, I think Judge Maurer indicated that she would be available. I think she's one judge that may be available this morning to talk to you, [defendant].

"THE DEFENDANT: Okay."

After speaking with his attorney and Judge Maurer, defendant continued to ask for another attorney. The trial court stated that it would not appoint another attorney, and that defendant could continue with his current attorney or represent himself. The court then engaged in the following dialogue with defendant:

"THE DEFENDANT: So I have to represent myself?

"THE COURT: Well, it's your decision what you want to do. You're not going to have a new attorney appointed today to try the case today. Just cannot happen.

"THE DEFENDANT: Even though—even though we got a conflict of interest, I still don't get another attorney?

"THE COURT: Well, you created the conflict.

"THE DEFENDANT: I created the conflict?

"THE COURT: Sure. You wrote letters to the bar. You've written letters to the bar about every lawyer you've had. I mean, you can't create conflicts and then come in and say I want a new lawyer.

"THE DEFENDANT: So they can just do what they want to in my case and I don't have a right—why you got them for if you can't complain to them?

"THE COURT: This is not a question and answer period.

"THE DEFENDANT: That's what I thought. Going to do what you're going to do, whatever. Because now I don't have no rights no way, so do whatever you want to do. I don't want him. You going to make me take him. I can't represent myself. So it's your decision. It's your courtroom."

A few minutes later, the court had the following exchange with defendant's counsel and the deputy district attorney:

"THE COURT: All right. Now, in terms of just for my information, [defendant's attorney and deputy district attorney], since both of you were present during various hearings when his previous attorneys were—left the case or left representation, was that because there had been bar complaints filed or was there some other reason? Because I indicated my belief was that because of bar complaints that they withdrew.

"[DEPUTY DISTRICT ATTORNEY]: Your Honor, I can tell you that there was—first on the case was Miss Lynne Dickison, and I know that procedurally [defendant] has filed complaints on the whole process on all the attorneys and has repeatedly sent off mailings with different motions for his release, focusing almost exclusively on violation of a 60-day rule.

"With Miss Dickison, there was a, I think, a breakdown in their communication. He wasn't getting along with Miss Dickison. He had filed a bar complaint against her. She was subbed off. Of course, she was his first attorney at that point. She needed additional time to run her investigation and that caused [defendant] and her to have these difficulties. And I think when we went before Judge Frantz, that was the reason, rationale for the substitution of the attorney at that time.

"With Miss Gayle Kvernland, that was the second attorney who was appointed, and she also requested additional time to prepare and investigate the case. She, in the course of her investigation, became aware that she was representing a gentleman on a rape charge who shared the same mother, not a blood mother, but a woman who he referred to as his mother that [victim] also referred to as her mother.

"And in the course of her investigation of [this] case and this other gentleman's rape case that she was defending, she had to have contact with this mother and felt that she was not able to zealously represent [defendant] under those circumstances, having had the discussions with this mother about not only this rape defendant but also about [victim].

"And because she was able to state on the record that she could not zealously represent [defendant] given those circumstances, of course Judge Frantz did remove her at that time, did leave the bench and call [defendant's attorney] personally to see if he would take the case, given that there were 60-day issues and that [defendant] wanted to try the case just as soon as possible.

"THE COURT:    And she did make a good cause extension finding—

"[DEPUTY DISTRICT ATTORNEY]:    Yes.

"THE COURT:    —at that time?

"[DEPUTY DISTRICT ATTORNEY]:    Yes. And I remember being at that hearing, Your Honor, that in each one of these extensions there have been a lengthy—I can tell you a lengthy, similar to what we've done here this morning, discussion, explanation by the courts with [defendant] about the consequences of getting a new attorney, about the consequences of filing bar complaints and failing to withdraw bar complaints and continuing down that path, that it would only in effect prolong matters because any court would give a new attorney adequate time to prepare, obviously to avoid any post conviction relief problems that might arise from being inadequately prepared in one's defense.

"* * * * *

"THE COURT:    I have denied his motion to have [defendant's attorney] removed as his attorney."

On appeal, defendant argues that the trial court erred by refusing to replace his attorney, thereby violating his right to counsel under ORS 135.045,[1] Article I, section 11, of the Oregon Constitution,[2] and the Sixth Amendment to the

---

[1] ORS 135.045 provides, in part:

"(1)(a) If the defendant in a criminal action appears without counsel at arraignment or thereafter, the court shall determine whether the defendant wishes to be represented by counsel.

"(b) If the defendant does wish to be represented by counsel, the court, in accordance with ORS 135.050, shall appoint counsel to represent the defendant."

[2] Article I, section 11, of the Oregon Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right to * * * be heard by himself and counsel."

United States Constitution.[3] In general, the right to substitute court-appointed counsel is not absolute, and we review the trial court's decision for abuse of discretion. "The exercise of that discretion requires a balancing of a defendant's right to effective counsel and the need for an orderly and efficient judicial process." *State v. Edwards*, 132 Or App 590, 593, 890 P2d 420 (1995). In *State v. Langley*, 314 Or 247, 257, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993), the court stated that "a defendant has 'no right to have another court-appointed lawyer in the absence of a legitimate complaint concerning the one already appointed for him' " (quoting *State v. Davidson*, 252 Or 617, 620, 451 P2d 481 (1969)). According to the *Langley* court, a legitimate complaint is "one that is based on an abridgement of a criminal defendant's constitutional right to counsel," and that "[a] simple loss of confidence or disagreement with counsel's approach to matters of strategy is not cause to substitute one appointed lawyer for another." 314 Or at 258.

■     First, we address defendant's argument under the governing statutes. In accordance with ORS 135.045(1)(b), the court appointed counsel to represent defendant at trial. No language in that statute requires the court to appoint substitute counsel merely because a defendant has filed an ethics complaint against his present attorney. Defendant does not cite ORS 135.050(5) (2001), but by its terms it appears to apply. At the time of defendant's trial, it provided, in part, that "[t]he court having jurisdiction of the case may substitute one appointed counsel for another at any stage of the proceedings when the interests of justice require such substitution."[4] As shown above, defendant's complaints were that he was held in custody when substitute counsel was appointed to represent him, that he had filed a Bar complaint

---

[3] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

[4] Since the time of defendant's trial, ORS 135.050(5) was renumbered as ORS 135.050(6) and amended in 2003 to provide, in relevant part:

"The court having jurisdiction of the case may not substitute one appointed counsel for another except pursuant to the policies, procedures, standards and guidelines of the Public Defense Services Commission under ORS 151.216."

We refer to the 2001 version of the statute throughout this opinion.

against counsel, that counsel did not talk to him as much as defendant desired, that counsel had not called the witnesses that he wanted subpoenaed, and that counsel had "done nothing" on his case. The trial court noted that counsel needed time to prepare for the case after his appointment, that counsel had achieved a favorable result in the first trial, and that counsel did not have to subpoena every witness that defendant wanted subpoenaed. The court allowed defendant to speak to another judge about his concerns and based its ruling in part on the facts that the case was over a year old, that it was the day of trial, that witnesses were present and prepared to testify, and that defense counsel had expressed his willingness to proceed. Under all the above circumstances, including the fact that defendant had filed an ethics complaint against his counsel, the trial court did not abuse its discretion in refusing to appoint another attorney under ORS 135.050(5) (2001).

We turn now to defendant's arguments based on constitutional provisions, provisions that appear to impose similar, if not identical, standards. Arguments similar to defendant's were recently addressed by the Oregon Supreme Court in *State v. Smith*, 339 Or 515, 123 P3d 261 (2005). There, the court examined the scope of a trial court's obligation to make an inquiry when a defendant requests new counsel because he is dissatisfied with his current counsel. The defendant in *Smith* asked for a new attorney on the day of trial because he was unhappy with his current attorney and how the attorney was handling his case. The trial court listened to the defendant's complaints, but did not ask any questions regarding the basis of the complaints or hold a hearing regarding them. The trial court then expressed his confidence in the defense attorney and denied the request to appoint substitute counsel. On appeal, we held that the trial court had erred by failing to inquire into the defendant's complaints about his attorney and remanded the case to the trial court to conduct such an inquiry. *State v. Smith*, 187 Or App 562, 564, 69 P3d 787 (2003).

On review, the Supreme Court reversed, finding that, although "a trial court has an obligation to consider and grant or deny a motion for substitute counsel and to exercise its discretion in doing so," it does not have "an affirmative

duty to conduct an inquiry and make a factual assessment in response to a defendant's complaints about appointed counsel." *Smith*, 339 Or at 525. Instead, the court should engage "in such inquiry as the nature of the defendant's complaints requires." *Id*. at 530. The court then held that, because the trial court heard and considered the defendant's concerns and concluded that he had not demonstrated a legitimate reason for the court to appoint substitute counsel, it did not abuse its discretion in denying the request.

This case differs from *Smith* in that defendant's complaints about his attorney included the assertion that defendant had filed a Bar complaint against the attorney that created a conflict of interest. In *Smith*, the court noted in *dicta* that, "where the trial court knows or reasonably should know from the record before it that appointed counsel may have a conflict of interest, the trial court is obligated to inquire about that potential conflict," *id*. at 527 n 4 (citing *Wood v. Georgia*, 450 US 261, 271-74, 101 S Ct 1097, 67 L Ed 2d 220 (1981)).[5] Here, defendant made it abundantly clear to the trial court that he believed an actual conflict of interest existed between him and his counsel and that he was entitled to the appointment of substitute counsel. The trial court made the inquiry set forth above. The question remains whether defendant's constitutional rights were violated by the trial court's denial of defendant's motion for appointment of substitute counsel in light of the court's inquiry.

In *Mickens v. Taylor*, 535 US 162, 166, 122 S Ct 1237, 152 L Ed 2d 291 (2001), the Supreme Court explained:

---

[5] In *Wood*, the Court held that, based on the record before it, the possibility that an attorney representing three codefendants was actively representing conflicting interests "was sufficiently apparent" that it imposed upon the trial court a duty to inquire further into the conflict. *Wood*, 450 US at 272. Because the Court could not be sure that the conflict influenced the attorney in his trial decisions, it remanded for the trial court "to determine whether the conflict of interest that this record strongly suggests actually existed." *Id*. at 273. Later, clarifying *Wood*, the Court held that " 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 US 162, 171, 122 S Ct 1237, 152 L Ed 2d 291 (2001) (emphasis in original). Therefore, the Court held that, in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known, a defendant must establish that a conflict of interest adversely affected his counsel's performance. *Id*. at 173-74.

"The Sixth Amendment provides that a criminal defendant shall have the right to 'the Assistance of Counsel for his defence.' This right has been accorded, we have said, 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.' *United States v. Cronic*, 466 US 648, 658, 104 S Ct 2039, 80 L Ed 2d 657 (1984). It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate, see *Strickland v. Washington*, 466 US 668, 685-686, 104 S Ct 2052, 80 L Ed 2d 674 (1984); and it also follows that defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation. As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Id.*, at 694, 104 S Ct 2052."

■    Here, defendant asserted only the bare fact that he had filed a Bar complaint against his attorney. The trial court engaged in an extended colloquy with defendant regarding his complaints about counsel and concluded that his complaints lacked merit. Indeed, defendant's counsel stated that he was unable to find any grounds for a motion to withdraw and was ready and willing to continue with trial. On these facts, we hold that the trial court did not abuse its discretion by denying defendant's motion for substitute counsel because defendant did not demonstrate a reasonable probability that a conflict existed that affected counsel's performance, as distinguished from a theoretical conflict of interest.[6]

---

[6] Other courts have found that the filing of a disciplinary complaint does not automatically create a conflict of interest. *See State v. Sinclair*, 46 Wash App 433, 436, 730 P2d 742, 744 (1986) ("Sinclair argues that, since he had filed a formal complaint against his lawyer with the State Bar Association, her continued representation would have created a conflict of interest in violation of the Code of Professional Responsibility. Were that sufficient to disqualify court-appointed counsel, however, a defendant could force the appointment of a new attorney simply by filing such a complaint, regardless of its merit. We hold the trial court did not abuse its discretion by denying Sinclair's request for a new attorney."); *State v. Robertson*, 30 Kan App 2d 639, 641-42, 44 P3d 1283, 1286 (2002) (filing of a disciplinary complaint against defense counsel does not create a *per se* conflict of interest; defendant is required to show actual conflict of interest, and such complaint may create an actual conflict of interest depending on the nature of the complaint; and "an attorney's best defense to a disciplinary complaint is to provide the defendant with the best possible defense and, as such, a pending disciplinary complaint does not necessarily create a conflict of interest").

■■ Defendant next argues that the trial court erred by refusing to give a lesser-included offense instruction to the jury for assault in the third degree. Our review of such a claim is for errors of law, *State v. Lee*, 174 Or App 119, 125, 23 P3d 999, *rev den*, 332 Or 559 (2001), and we view the facts in the light most favorable to defendant to determine whether there was evidence to support the requested instruction. *State v. Loew*, 130 Or App 370, 372, 881 P2d 837 (1994). The right to a lesser-included offense instruction requires " 'evidence, or an inference which can be drawn from the evidence, which supports the requested instruction so that the jury could rationally and consistently find the defendant guilty of the lesser offense and innocent of the greater.' " *State v. Cunningham*, 320 Or 47, 58, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995) (quoting *State v. Washington*, 273 Or 829, 835-36, 543 P2d 1058 (1975)).

■ Here, defendant was charged with assault in the second degree, a charge that requires that a person intentionally or knowingly[7] cause serious physical injury to another. ORS 163.175(1)(a). Defendant requested that the trial court give the lesser-included instruction for assault in the third degree, which requires only a finding that a person act recklessly.[8] However, defendant testified at trial that he *intended* to hit the victim in the face to make her let go of a knife, thus precluding a finding that he acted recklessly. Therefore, the trial court did not err by refusing to give the requested instruction.

---

[7] *See* ORS 161.085, which provides, in part:

"(7) 'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described.

"(8) 'Knowingly' or 'with knowledge,' when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists."

[8] ORS 161.085(9) provides:

" 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

In his fourth assignment, defendant argues that the trial court erred when it imposed an upward durational departure sentence of 130 months' imprisonment plus a 36-month period of post-prison supervision that exceeds the statutory maximum sentence of ten years for a Class B felony. The state concedes that the error is apparent on the face of the record, ORAP 5.45. We accept the concession and therefore remand for resentencing. ORS 138.222(5)(a).

A discussion of defendant's remaining assignments of error would not benefit either the bench or the Bar.

Sentence vacated; remanded for resentencing; otherwise affirmed.