**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STEPHEN EDWARD MAY,
            *Petitioner-Appellee/*
            *Cross-Appellant*,

                    v.

DAVID SHINN;* MARK BRNOVICH,
Attorney General,
            *Respondents-Appellants/*
            *Cross-Appellees.*

Nos.  17-15603
        17-15704

D.C. No.
2:14-cv-00409-
NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted March 7, 2019
Phoenix, Arizona

Filed March 27, 2020**

---

* David Shinn is automatically substituted for his predecessor under Federal Rule of Appellate Procedure 43(c)(2).

** This case was originally the subject of a memorandum disposition. *See May v. Ryan*, 766 F. App'x 505 (Mar. 26, 2019). Subsequently, the State filed a petition for panel rehearing and rehearing en banc arguing that an aspect of the procedural history of the state trial proceedings had been misinterpreted. *See* Fed. R. App. P. 40(a)(2). We issue this revised disposition in response.

Before: Sandra S. Ikuta and Michelle T. Friedland, Circuit Judges, and Frederic Block,*** District Judge.

Opinion by Judge Friedland;
Concurrence by Judge Ikuta;
Concurrence by Judge Friedland;
Dissent by Judge Block

## SUMMARY****

### Habeas Corpus

In an appeal and cross-appeal from the district court's decision on Stephen May's habeas corpus petition challenging his Arizona state conviction on five counts of child molestation, the panel (1) rejected May's claim for habeas relief based on his trial attorney's failure to object to the resumption of jury deliberations; and (2) rejected his other arguments for habeas relief in a concurrently filed memorandum disposition.

After the close of evidence, the jury reported that it was deadlocked, and the judge declared a mistrial. Several minutes later, the jury requested permission to resume deliberations. May's defense lawyer did not object to such a resumption, which the judge then permitted, and the jury

---

*** The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

**** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

convicted May on most counts. May argued in his habeas petition that his lawyer's failure to object amounted to ineffective assistance of counsel. The district court accepted the magistrate judge's determination that the lawyer's failure to object was neither deficient performance nor prejudicial. The panel held that counsel's performance was not deficient because, on the facts of this case, it was a reasonable prediction that May had a better chance of a more favorable verdict from the existing jury on the existing trial record than he would from a retrial.

Concurring, Judge Ikuta wrote that in adhering to the limited scope of federal habeas review, the panel upholds the fundamental principles of our legal system.

Concurring, Judge Friedland wrote separately to express dismay at the outcome of the case. She wrote that the evidence of guilt was very thin and the length of his sentence all but ensures he will spend the rest of his life in prison, but given the significant constraints on the scope of review, the panel is not in a position to do more than decide the narrow question whether the proceedings in this case were so egregiously unfair that they violated the Constitution.

Dissenting, District Judge Block wrote that the majority ignores *Strickland v. Washington*'s constitutional underpinning that deference is due only "to counsel's *informed* decisions," and that the facts of this case unequivocally show that counsel's decision was the antithesis of an informed decision.

**COUNSEL**

Robert A. Walsh (argued), Assistant Attorney General, Criminal Appeals Section; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondents-Appellants/Cross-Appellees.

Erica T. Dubno (argued), Fahringer & Dubno Herald Price Fahringer PLLC, New York, New York; Robert J. McWhirter, Law Offices of Robert J. McWhirter, Phoenix, Arizona; Michael D. Kimerer, Kimerer & Derrick P.C., Phoenix, Arizona; for Petitioner-Appellee/Cross-Appellant.

Mikel Patrick Steinfeld, Phoenix, Arizona, for Amicus Curiae Arizona Attorneys for Criminal Justice.

J. Thomas Sullivan, Little Rock, Arkansas, for Amicus Curiae National Association for Rational Sex Offense Laws.

**OPINION**

FRIEDLAND, Circuit Judge:

Appellant Stephen May seeks habeas corpus relief, arguing that he was deprived of his Sixth Amendment right to counsel because the defense lawyer who represented him in his child molestation trial in Arizona state court was ineffective. After the close of evidence in that trial, the jury reported that it was deadlocked, and the judge declared a mistrial. Several minutes later, however, the jury requested permission to resume deliberations. May's defense lawyer did not object to such a resumption, which the judge then permitted. The jury convicted May on most counts. May now argues that his lawyer's failure to object amounted to

constitutionally deficient performance. We hold that May's counsel was not ineffective because, on the facts of this case, it was a reasonable prediction that May had a better chance of a more favorable verdict from the existing jury on the existing trial record than he would from a retrial.[1]

## I.

A grand jury in Maricopa County, Arizona indicted Stephen May in 2006 on eight counts of child molestation. The indictment alleged that May had engaged in sexual contact with five children: Taylor (Counts 1 and 2), Danielle (Counts 3 and 4), Sheldon (Counts 5 and 6), Luis (Count 7), and Nicholas (Count 8). May's lawyer, Joel Thompson, subsequently filed a motion to sever, arguing that the count or counts related to each individual child must be tried separately. The motion contended that severance was required under an Arizona rule entitling some defendants to severance of an offense "unless evidence of the other offense or offenses would be admissible" if there were separate trials. *See* Ariz. R. Crim. P. 13.4(b).[2]

The trial court granted the motion in part by severing the count related to Nicholas. Ruling from the bench, the judge made reference to the fact that the count related to Nicholas alleged that he had been molested at a daycare center where

---

[1] May presses other arguments for why he is entitled to habeas corpus relief. We reject all those arguments in a concurrently filed memorandum disposition.

[2] This rule provides in full: "A defendant is entitled to a severance of offenses joined solely under Rule 13.3(a)(1) [allowing for joinder of offenses that are of the same or similar character], unless evidence of the other offense or offenses would be admissible if the offenses were tried separately." Ariz. R. Crim. P. 13.4(b).

May worked in 2001, while the counts related to the other children involved allegations of molestation occurring between 2003 and 2005. Because the timing and other "circumstances" of the count related to Nicholas were "different," and there had also "been a loss of evidence" with respect to that count, the judge determined that the evidence concerning the other children would be "more prejudicial than probative on that count."

The court declined to sever any of the other counts. It explained that the evidence concerning each of the remaining children would have been admissible to prove the counts related to the other children if they were tried separately. Under Arizona Rule of Evidence 404(b), such "evidence of other crimes, wrongs, or acts" is admissible for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See* Ariz. R. Evid. 404(b). And under Rule 404(c), such "evidence of other crimes, wrongs, or acts" could additionally be admissible "to show that [May] had a character trait giving rise to an aberrant sexual propensity to commit the offense[s] charged." *See* Ariz. R. Evid. 404(c).

The counts related to Luis, Taylor, Danielle, and Sheldon therefore proceeded to trial in January 2007. At trial, the State's evidence consisted primarily of testimony from the four children and some of their parents.

Luis testified first. Luis attended an elementary school where May was employed for several months. May worked with first graders with special needs who would be integrated into Luis's class for certain activities, including computer lab. Luis testified that one day in computer lab May came over to help him. While May's right hand was holding the computer mouse, May's left hand touched Luis's "private part" over his pants. Luis testified that May did not

move the hand that was touching his genital area.[3] Luis testified that two adults other than May and about twenty children were present when this happened.

Luis testified that he told his mother about May touching him. His mother confirmed this in her testimony at trial, and she further testified that Luis said May touched him on purpose. Luis testified that he never talked to police about May, but a detective who had interviewed Luis soon after the incident testified at trial about that interview. The detective testified that he did not report Luis's allegations to prosecutors after the interview because Luis was unable to provide details about the incident, such as the time frame in which it occurred or the people who were nearby.

Luis testified at one point during trial that May was clean-shaven at the time he worked at Luis's school; at another point, Luis testified that May had a beard. When the prosecutor asked Luis if he saw May, who was in the courtroom at the time, Luis said no. Later, after a recess, the prosecutor showed Luis a photographic line-up. Regarding the photograph of May, Luis testified that it "kind of look[ed] like Mr. May." Luis testified that the other photographs did not depict anyone who looked familiar.

The other children—Taylor, Danielle, and Sheldon—all knew May because they lived at the same apartment complex as him.[4] That apartment complex had a pool where May spent much of his time. May gave swim lessons at the pool, kept an eye on the children playing at the pool for their

---

[3] When Luis initially told his mother about the alleged incident, Luis said that May did move his hand.

[4] Luis testified that he did not know Taylor, Danielle, or Sheldon.

parents, and attended barbecues hosted at the pool by residents of the complex.

Taylor and Danielle were close friends. Prior to trial, Taylor had told police that May touched her genital area on two occasions in 2005 when she was eight years old, once before a birthday party for Danielle held at the apartment complex's pool and once afterward. Taylor testified at trial that the first time, she was in the pool and swam over to May, who was in the shallow end. Taylor testified that she sat in May's lap, and May touched her "private" over her bathing suit with his hand. She did not recall whether May moved his hand when he touched her. At the time, Taylor thought May "was just being clumsy" and "didn't think he meant it." Taylor also testified that another adult was present when this happened.

When the prosecutor asked Taylor at trial if she recalled telling police about a time she was in the pool "after Danielle's birthday," Taylor responded, "Barely. I kinda remember. I kinda don't." In response to further questioning by the prosecutor, Taylor testified that she remembered telling police that May had touched her genital area over her clothing. But during cross-examination, Taylor testified that she did not recall what had actually happened. Taylor testified that she eventually came to think May's touching was not an accident and therefore stopped going to the pool.

Like Taylor, Danielle had told police about multiple incidents.[5] At trial, Danielle testified that May touched her

---

[5] Danielle's father testified at trial that, when he spoke to Danielle prior to her interview with police, she recalled only one incident. Danielle stated in the police interview that May touched her every time

genital area over her bathing suit at her eighth birthday party. About forty people, including twenty adults, were present at the pool during the party. Danielle testified that she and May were in the jacuzzi. May "put [her] on his lap," and he touched her "private parts" on top of her bathing suit. The prosecutor asked Danielle if she also remembered "another time earlier in the summer that you had a barbecue and [May] touched you[.]" Danielle replied, "No." The prosecutor further asked Danielle if she remembered telling police about a "barbecue at the beginning of the summer" where May "touched you again with his hand." Danielle responded that she did remember telling police, but indicated that she did not remember the touching.

Finally, Sheldon (who knew Danielle and Taylor) testified that there were two occasions on which May touched his genital area. About a week after July 4, 2005, Sheldon, who was then nine years old, was at the pool with May and at least one other person.[6] Sheldon testified that May "picked me up and he tossed me inside the pool." Sheldon testified that as May did so, one of May's hands was on his back and the other was "in [his] private spot" over his trunks. Sheldon testified that May did not make any movements with the hand on his trunks. Sheldon testified that he moved May's hand to his stomach, but that May moved that hand back down to his genital area. On one prior

---

they were both at the pool. At trial, when asked if she "remember[ed] telling police that this touching happened every time [she] went to the pool," Danielle responded, "[n]o, it didn't happen every time I went to the pool."

[6] Sheldon testified at one point that his brother was the only other person present. At another point, Sheldon appeared to testify that Taylor, her mother, and a teenager whose name he could not recall were the only other people present.

occasion, Sheldon testified, May had similarly touched his genital area while throwing him in the pool. Sheldon could not recall exactly when this had happened. But he did remember that others were present at the time.

Sheldon testified that he initially thought May touched him by accident, but that he changed his mind after talking to his mother and Taylor's mother. Taylor's mother later testified that, soon after Taylor gave a statement to police, Sheldon "came up to [her] and told [her] what had happened to him." Sheldon's stepfather also testified that he and Sheldon's mother approached Sheldon about May and that Sheldon was initially reluctant to talk but eventually said that May had touched his genital area.

Additional testimony at trial established that the children who lived in May's apartment complex had talked to each other about being touched by May. Taylor and Danielle both testified that they had talked to each other about May touching them. Sheldon testified that he had not talked to Taylor and Danielle about May, but other testimony at trial revealed that when Sheldon was interviewed by police prior to trial, he told them he had talked to Taylor. All three children also spoke to a parent or another adult before telling police that May touched them.

Near the end of trial, May took the stand. May described his teaching background; among other things, he had worked at a Montessori school, as a swim and American Red Cross instructor, and at a child care center. May testified that he has an undiagnosed "neurological condition" and as a result has "nervous tics" and "tend[s] to be clumsy." May explained that "there are very few fine motor things that [he] can do with [his] left hand or [his] left-hand side." May testified that he never intended to touch the children in their

genital areas, and that he never had any sexual interest in the children.

The prosecutor's cross-examination focused in part on statements May had made in an interview with a detective. During that interview, the detective had listed the names of several children, and May had responded by stating that he did not even know a half dozen children. But May testified at trial that he knew many children from his work teaching children. He testified that he did not remember what he meant when he told the detective otherwise.

May had also stated in the interview, "I don't know no somebody [sic] named Sheldon." But May testified at trial that he knew a Sheldon from the pool at his apartment complex. May also testified that he was "very frustrated" during the interview: "[The detective] asked me about several other children whose names I do not know, and Sheldon's name came up and [my response] may have been a reflex answer at that point in time."

In all, the jury heard evidence for five days.

During closing statements, the prosecutor highlighted the testimony the four children had given about being touched by May, and May's statements to the detective that he did not know Sheldon or many children at all. The prosecutor also argued that the children's allegations could not have been the product of them "talk[ing] to each other" and "mak[ing] up something." The prosecutor noted that Luis did not even know the other children. And if the children had purposefully made up stories, the prosecutor contended, they would not have testified at trial that they could not remember what had happened.

Defense counsel Thompson emphasized that the children had given inconsistent statements and sometimes could not recall what had happened. He also pointed out that adults were present on many of the occasions when May allegedly touched a child, yet none of those adults ever saw anything. Thompson argued that the children's stories about May touching them were the product of the children's talking to each other or of an adult's suggesting that they had been inappropriately touched.

The trial judge read instructions to the jury and also gave the jury a hard copy of those instructions. One instruction stated: "Each count charges a separate and distinct offense. You must decide each count separately on the evidence with the law applicable to it, uninfluenced by your decision on any other count." The jury sent the judge four notes about this instruction on the second day of deliberations. The most comprehensive of the notes asked:

> The evidence we have heard on certain counts appears to [corroborate] the information on other counts. The instructions say, "[E]ach count charges a separate and distinct offen[s]e. You must decide . . . on any other count[.]" ([P]age 7 of final instructions[.]) Can the evidence provided to support one allegation lend support to a separate allegation?[7]

---

[7] The other notes asked: "Can we use [corroborating] evidence? Yes or no[?] ([I]n refer[e]nce to [p]age 7 of the final instructions that each count is a sep[a]rate and distinct offen[s]e?)"; "Is the information labelled 'sep[a]rate counts' on page 7 of the final instructions one and the same with the term [corroboration]?"; "All 7 counts are distinct and

The court responded with the following instruction:

> Evidence of other acts has been presented. You may consider this evidence only if you find that the State has proved by clear and convincing evidence that the defendant committed these acts. You may only consider this evidence to establish the defendant's motive, opportunity, intent, plan, absence of mistake or accident. You must not consider this evidence to determine the defendant's character or character trait, or to determine that the defendant acted in conformity with the defendant's character or character trait and therefore committed the charged offense.

The instruction tracked Arizona Rule of Evidence 404(b), which provides that "evidence of other crimes, wrongs, or acts . . . may . . . be admissible . . . as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b).[8] The instruction also made clear that the jury could not consider the evidence for the purpose described in Rule 404(c): "to show that the defendant had a character trait

---

sep[a]rate counts but they all involve the same subject, can we use [corroboration]?".

[8] The Arizona Supreme Court held in *State v. Terrazas*, 944 P.2d 1194 (Ariz. 1997), that "evidence of prior bad acts" is only admissible under Rule 404(b) in a criminal case if there is clear and convincing proof of those acts. *Id.* at 1196, 1198.

giving rise to an aberrant sexual propensity to commit the offense charged." Ariz. R. Evid. 404(c).[9]

About an hour after receiving this responsive instruction, the jury reported that it was deadlocked. The jury explained in a note: "We are a hung jury because the not guilty side doesn't believe there is enough evidence and the guilty side believes there is." The judge called the jury into the courtroom and suggested that the jury "identify areas of agreement and disagreement and discuss the law and the evidence as they relate to those areas of disagreement." Shortly after resuming deliberations, the jury reported that it was still deadlocked. The jury's note stated that "[p]art of the jury believes they have heard sufficient evidence," while "[p]art of the jury believes the quantity and quality of the evidence is not sufficient." The court declared a mistrial and excused the jury.

No more than several minutes later, the judge announced that "[t]he bailiff has received a communication from the jury that they do not wish to have a hung jury and wish to continue deliberating and communicate that to the counsel." The judge then asked the prosecutor and defense counsel Thompson if either had any objection. Thompson consulted with May for about twenty to thirty seconds. Both Thompson and the prosecutor then said they had no objection. In an interview occurring two years after May's

---

[9] The prosecutor did not object to the instruction. Nor did the prosecutor attempt to argue during trial that evidence of other acts could be used to show May's propensity to molest children. In fact, any reference to character evidence at trial or in the instruction may have been foreclosed once the trial began, given that the procedures for admitting evidence under Rule 404(c) had apparently not been followed. *See* Ariz. R. Evid. 404(c)(1)(D), (c)(3) (requiring the court to make certain findings and requiring the prosecutor to make disclosures).

trial, one juror stated that all the jurors used their cell phones after being excused, but this fact was apparently not known to Thompson, the prosecutor, or the judge at the time.

The jury reassembled and deliberated for about an hour more before recessing for the weekend. When the jury returned from that recess, it deliberated for several hours and then announced that it had reached a verdict. The jury convicted May on the five counts related to Luis, Taylor, and Danielle. It acquitted him on the two counts related to Sheldon.

Trial on the severed count related to Nicholas was scheduled to begin two days later. But Nicholas's parents represented to the trial court that they had been unable to arrange for counseling, which they wanted Nicholas to have if he was going to go through the traumatic process of testifying. The court therefore dismissed the case without prejudice so that the "State [could] reevaluate it after the victim has had counseling."

For each of the five counts that May was convicted on, Arizona law provided a "presumptive term of imprisonment" of seventeen years. Ariz. Rev. Stat. Ann. § 13-604.01(D) (2007).[10] That presumptive sentence could be "increased or decreased by up to seven years." *Id.* § 13-604.01(F). Sentences for all the counts related to a particular victim could run concurrently. *Id.* § 13-604.01(K). Thus, the minimum sentence for May would have been two ten-year terms running concurrently for the counts related to Taylor, two ten-year terms running concurrently for the counts related to Danielle, and ten years for the count related

---

[10] All further references to this statute are to the 2007 version that was in effect when May was sentenced.

to Luis—that is, an aggregate minimum sentence of thirty years.

The trial court sentenced May to five consecutive sentences of fifteen years, or seventy-five years total. The court ruled that a "slightly mitigated term" of fifteen years per count was "appropriate." The judge cited May's "social background," "physical impairment," "lack of criminal history," and "extensive family and community support." Noting that Arizona law allowed "discretion to run some of [the sentences] concurrent," the judge declined to do so. The judge stated that, "because of the nature of these offenses, [she didn't] think that would be justice in this case."

On direct appeal, the Arizona Court of Appeals affirmed May's conviction and sentence. The Arizona Supreme Court denied May's petition for review, and the U.S. Supreme Court denied May's petition for a writ of certiorari.

May sought post-conviction relief in Arizona court. Among other claims, May contended that his trial counsel Thompson was ineffective because he had failed to object to the resumption of jury deliberations after the trial court declared a mistrial. May retained a defense strategy expert, who testified at an evidentiary hearing that he believed Thompson was ineffective. May also submitted a declaration from Thompson, in which Thompson stated that, before responding that the defense had no objection to the jury's resuming deliberations, he had a "very brief conversation" with May about the alternative strategies of continuing with the jury or risking a retrial. Thompson further stated that he was "[c]aught in the moment by a circumstance [he] had never before encountered in almost 300 previous felony jury trial [sic]."

The Arizona Superior Court ("PCR court") denied relief. It determined that Thompson's performance was not deficient because "[t]he decision on whether to object to resumption of jury deliberations was a tactical and strategic decision by defense counsel that can't form the basis for a claim of ineffective assistance of counsel." Even if Thompson's performance was deficient, the PCR court concluded that there was "no evidence of any resulting prejudice to" May.

The Arizona Court of Appeals affirmed. With respect to May's claim that Thompson was ineffective for failing to object to the resumption of jury deliberations, the court of appeals "assum[ed], without deciding, that counsel's performance was deficient." The court of appeals held that "May cannot show prejudice," which "is fatal to a claim of ineffective assistance of counsel." Both the Arizona Supreme Court and the U.S. Supreme Court declined review.

In 2014, May filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the District of Arizona. May again argued that Thompson rendered ineffective assistance of counsel by failing to object to the resumption of jury deliberations. The district court accepted the magistrate judge's determination that Thompson's failure to object "was neither deficient performance nor prejudicial." But the district court granted habeas relief on another ground that May had raised: that the Arizona child molestation statute under which May was convicted was unconstitutional.[11]

---

[11] This is among the issues we discuss in a concurrently filed memorandum disposition. *See supra* note 1. We hold there that because the challenge to the constitutionality of the statute was procedurally

The State appeals the district court's grant of habeas relief.  May cross-appeals the district court's decision to the extent it rejected claims in his habeas petition.  Repeating his argument that defense counsel was ineffective for failing to object to the resumption of jury deliberations, May contends that the district court erred in denying relief on that claim.

## II.

An ineffective assistance of counsel claim requires (1) establishing deficient performance by "show[ing] [that] 'counsel's representation fell below an objective standard of reasonableness,'" and (2) establishing prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009) (per curiam) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

For the reasons explained below, we hold that May's lawyer did not render deficient performance under the standard outlined in *Strickland* by failing to object to the resumption of jury deliberations after the trial court declared a mistrial.  Because we would reach this conclusion regardless of whether we reviewed the performance question de novo (as the dissent does, Dissent at 40) or with deference under the Antiterrorism and Effective Death Penalty Act, *see* 28 U.S.C. § 2254(d), we need not decide which standard of review applies here.  *See Berghuis v. Thompkins*, 560 U.S. 370, 389–90 (2010).  We also need not decide whether May

---

defaulted and May cannot show cause and prejudice to overcome that default, the district court erred in granting habeas relief.

has satisfied the prejudice prong of *Strickland* because his claim fails on the performance prong.

## A.

"The proper measure of attorney performance" when evaluating a claim that the Sixth Amendment right to effective assistance of counsel was violated is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688; *see also Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (noting that "constitutional deficiency . . . is necessarily linked to the practice and expectations of the legal community" (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010))). A defense attorney faces "any number of choices about how best to make a client's case." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017). Counsel "discharge[s] his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 690). "[O]nly when [a] lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed . . . by the Sixth Amendment'" has the lawyer rendered constitutionally deficient performance. *Id.* (quoting *Strickland*, 466 U.S. at 687).

The Supreme Court has made clear that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Put differently, the "defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation marks omitted).

Under the deferential review required by *Strickland*, we cannot say that Thompson's decision to continue with the current jury rather than risking a retrial—which he reached after briefly consulting with May about the choice—fell outside "the wide range of reasonable professional assistance." *See id.*

**B.**

There were good reasons to think that sticking with the current trial record and jury would better serve May's interests than would a new trial. When a jury indicates that it is deadlocked, a rational defendant deciding between a mistrial or staying the course with the current jury "would compare the likely consequences of allowing the jury to deliberate longer with the likely consequences of obtaining a mistrial." *Brewster v. Hetzel*, 913 F.3d 1042, 1058 (11th Cir. 2019) (quoting *Lane v. Lord*, 815 F.2d 876, 879 (2d Cir. 1987)); *see also United States v. Beckerman*, 516 F.2d 905, 909 (2d Cir. 1975) (noting that the "report of a jury in deadlock *could* be welcome news to an accused who is fearful of his fate" and therefore welcomes a mistrial, but also contemplating the possibility that the defendant might "ha[ve] an interest in having guilt determined by this particular jury" (emphasis added)). Here, it was objectively reasonable to think that acquittal on some or all counts was a real possibility if May continued with the current jury, while a mistrial likely would have led to a retrial that could well have resulted in conviction on all counts. Because Thompson's failure to object to the resumption of deliberations "falls within the range of reasonable representation," we "need not determine the actual

explanation for [his] failure to object." *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991).**[12]**

The fact that the jury was deadlocked meant that at least one juror wanted to acquit May.**[13]** And both parties agree that the State's evidence against May was far from overwhelming. All four children testified that other people were nearby when May touched their genital areas. Luis and Danielle testified that May touched them when more than twenty people, including other adults, were in the vicinity—but none of those people claimed to see anything. Luis was also unable to identify May in court. Taylor and Danielle testified that they were unable to remember an incident in which May had touched them that they had previously disclosed to police. And Sheldon testified that he thought that May's touching was accidental until Taylor's mother told him otherwise. The State had not offered any expert testimony to try to explain away these discrepancies in the children's accounts. Based on these and other weaknesses in the State's case, it was reasonable to think that the jury might acquit May if it continued deliberating. Indeed, the

---

**[12]** Thus, unlike the dissent, we do not discuss in detail the declaration Thompson prepared during these later habeas proceedings. *See* Dissent at 35–37.

**[13]** More specifically, the jury's reporting that it was deadlocked probably meant that at least one juror wanted to acquit on each of the counts. If the jury had reached a verdict on some counts, it apparently could have convicted May on those counts even if it was deadlocked on other counts. *See, e.g., State v. Cummings*, 716 P.2d 45, 46 & n.1 (Ariz. Ct. App. 1985).

jury ultimately did acquit May on the counts related to Sheldon.[14]

There was further reason to think the current trial record was more favorable to May than the record that might result from a retrial. In particular, the trial court gave the jury an instruction that was relatively favorable to May. That instruction permitted the jury to consider "[e]vidence of other acts" to "establish the defendant's motive, opportunity, intent, plan, absence of mistake or accident" in accordance with Arizona Rule of Evidence 404(b). *See* Ariz. R. Evid. 404(b). But, significantly, the instruction expressly forbade the jury from considering "[e]vidence of other acts" in accordance with Rule 404(c), which permits "evidence of other . . . acts . . . if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged." *See* Ariz. R. Evid. 404(c). The instruction admonished the jury: "You must not consider [evidence of other acts] to determine the defendant's character or character trait, or to determine that

---

[14] The dissent mentions an empirical study of juries that ultimately hang, which found that the final straw poll of such juries is three times more likely to favor conviction than acquittal. Dissent at 45 (citing *Lane*, 815 F.2d at 879, which discusses Harry Kalven, Jr. & Hans Zeisel, The American Jury (1966)). But that study additionally found that juries that do not hang are likewise far more likely to convict than acquit—statistics that bear on what could have been expected from a retrial. *See* Harry Kalven, Jr. & Hans Zeisel, The American Jury*: Notes for an English Controversy*, 48 Chi. Bar Ass'n Rec. 195, 196–97 (1967); *see also* Theodore Eisenberg et al., *Judge-Jury Agreement in Criminal Cases: A Partial Replication of Kalven and Zeisel's* The American Jury, 2 J. Empirical Legal Stud. 171, 182 tbl.2 (2005). Thus, to the extent the dissent relies on the study to conclude that the likelihood of conviction with an initially deadlocked jury is reason enough for defense counsel to generally take a mistrial, the study, viewed as a whole, does not support such a conclusion. *See* Dissent at 45.

the defendant acted in conformity with the defendant's character or character trait and therefore committed the charged offense." In other words, the jury could consider evidence that May had molested one child as, for example, evidence that May had not mistakenly or accidentally touched the other children. But the jury could not consider evidence that May had molested one child as evidence of sexual propensity to molest children generally.

It was a reasonable strategy to move forward with a jury that had specifically been prohibited from considering "evidence of other . . . acts" as proof of May's "aberrant sexual propensity." *See* Ariz. R. Evid. 404(c). At a retrial, the jury might have been allowed to consider other acts as evidence of May's character—which could have increased the risk that jurors would punish May for perceived bad character regardless of whether they were persuaded by the evidence that he had committed all of the alleged crimes. *See, e.g.*, 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5382 (criticizing Federal Rules of Evidence 413 to 415, which are similar to Arizona Rule of Evidence 404(c), because those provisions "[a]llow[] the jury to easily cast the defendant into the category of 'The Other,' as a 'lustful rapist' or a 'depraved child molester'"); *cf. State v. Garcia*, 28 P.3d 327, 334 (Ariz. Ct. App. 2001) (noting that "the potential for unfairness [was] particularly high" in a case where "many very young victims . . . each testif[ied] to multiple uncharged molestations," and where the trial judge admitted the uncharged acts as proof of the defendant's character). The difference between allowing in other acts to prove only May's intent, versus allowing in other acts to prove both May's intent and his character, could reasonably be viewed as a meaningful one by counsel in Thompson's shoes. *See generally State v. Scott*, 403 P.3d 595, 600 n.3 (Ariz. Ct.

App. 2017) (observing that the appropriate "consideration and use by the jury of evidence of a prior crime differs significantly depending upon whether it is admitted . . . under Rule 404(b), or 'to show that the defendant had a character trait giving rise to an aberrant sexual propensity . . .' under Rule 404(c)").

In the trial that happened, the prosecutor had not pursued the admission of character evidence under Rule 404(c) and had never asked the jurors to infer from a finding that May had engaged in any of the charged acts that he had a propensity for aberrant sexual acts. But once the prosecution knew that Thompson's primary strategy at trial had been to argue that May had never inappropriately touched the children at all—a defense that could be particularly undermined by propensity evidence if the jury did not believe that defense as to at least one child—the prosecution would be especially inclined to seek an instruction about propensity evidence at a retrial. And there was reason to think that if the prosecutor had requested use of Rule 404(c) evidence at a retrial, the court would have granted it. At the pretrial hearing on the motion to sever the counts against May, the trial court had expressly contemplated that the evidence with respect to each child could be admissible with respect to the other children under both Arizona Rule of Evidence 404(b) and Rule 404(c). In light of these considerations, it was a reasonable strategic choice for Thompson to allow the existing jury to continue deliberating with the more favorable instruction.

More generally, Thompson could reasonably have concluded that it would be risky to give the State a second bite at the apple because the State would be able to refine in other ways the case it presented at the first trial. *See generally, e.g.*, *United States v. DiFrancesco*, 449 U.S. 117,

128 (1980) ("[I]f the Government may reprosecute, it gains an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own."); *United States v. McGowan*, 668 F.3d 601, 606 (9th Cir. 2012) (noting that the prosecution may "learn from its mistakes and put [on] a more persuasive case the second time around" (quoting *United States v. Moran*, 393 F.3d 1, 10 (1st Cir. 2004))).    For example, the State argues that the prosecution could have "revis[ed] its cross-examination of May and other defense witnesses," "call[ed] new witnesses," and sought to reconsolidate the count related to Nicholas with the counts related to the other children.  The State also could have sought to address inconsistencies and gaps in the children's testimony by retaining an expert witness who might testify that "children's memories tend to be more simplistic and less rich in detail" and that "children do not tend to recall time[lines] and dates."  *See Kurtz v. Commonwealth*, 172 S.W.3d 409, 413 (Ky. 2005).  May's own defense strategy expert admitted that the State would benefit at any retrial from having a record of the first trial.

Of course, May would also profit from having that record at a retrial.  But it was reasonable to think the State would profit more.  Due to asymmetries in disclosure obligations, defense counsel was probably able to learn more about the prosecution's case before trial began than the other way around.  *Compare* Ariz. R. Crim. P. 15.1 (listing the State's relatively broader disclosure obligations), *with* Ariz. R. Crim. P. 15.2 (listing the defendant's relatively narrower disclosure obligations); *see also generally State v. Helmick*, 540 P.2d 638, 640 (Ariz. 1975) (observing that "discovery in a criminal case is not really a two-way street" because "[t]he constitutional protections of the Fifth and Fourteenth Amendments deny to the prosecution full disclosure of information from the defense" (quoting *Wright v. Superior*

*Court*, 517 P.2d 1261, 1264 (Ariz. 1974))).  At a retrial, any informational advantage the defense had prior to the first trial would be diminished.  *See* Stephen J. Schulhofer, *Jeopardy and Mistrials*, 125 U. Pa. L. Rev. 449, 506 (1977) ("The government may be aided upon retrial merely by having observed defense counsel's tactics on cross-examination or by having learned the nature of any substantive defense.  These possibilities are particularly important because . . . the prosecution generally lacks the opportunity to learn much prior to trial.").

The dissent contends that "any reasonable lawyer would have asked the court for some opportunity to investigate the facts and law" before acquiescing to the jury resuming deliberations.  Dissent at 43.  In support, the dissent argues that "[a]uthorities teaching that defendants benefit when hung juries result in mistrials are legion," and that Thompson "should have at least considered that the prevailing professional norm would counsel against rejecting a mistrial."  Dissent at 44, 45–46.  But, to the extent the dissent's cited authorities are on point, they are actually consistent with the notion that sometimes a reasonable strategy is to proceed with the current jury rather than risking a heightened chance of conviction at a retrial.  *See, e.g.*, *Lane*, 815 F.2d at 879 (recognizing that there is "some risk of facing what might be an enhanced prospect of conviction at a retrial"); Massachusetts Superior Court Criminal Practice Manual, Special Trial Issues § 18.2.2 (indicating that if "substantial issues of reasonable doubt have been raised by the defense," seeking a mistrial may not be the best strategy).  Even May's expert—who emphasized that "normally" defense counsel would object to the resumption of jury deliberations—seemed to recognize that there could be "pros" and "cons" to doing so.

The dissent's argument that Thompson should have attempted to ascertain the facts about "what may have occurred after the jury was discharged" fares no better. Dissent at 49–50. Investigation of the facts would have required questioning jurors in open court, in front of the judge and the prosecutor. The jurors presumably would have described using their cell phones after being excused. Even in the absence of evidence that jurors' use of their cell phones had prejudiced them—and we take this opportunity to note that the record before us is devoid of any such evidence—this could have prompted the judge to disallow further deliberations. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1895 (2016) (explaining that "courts should . . . ask to what extent just-dismissed jurors accessed their smartphones or the internet" when deciding whether to reempanel a jury); *State v. Crumley*, 625 P.2d 891, 895 (Ariz. 1981) ("It is simply too dangerous a practice to discharge the individual jurors . . . , send them back into the community . . . , and then recall those same jurors.").[15]

Whether refraining from questioning the jurors was deficient performance is ultimately the same question as whether failing to object to the resumption of deliberations was deficient performance. Having the jury sent home would have cost May any strategic advantage that could be gained by proceeding with the existing jury and the existing trial record. Given how the trial had played out, Thompson could reasonably have thought that there was such an

---

[15] The dissent speculates about other issues, such as the nature of "communications between the bailiff and the jurors" after the jurors were discharged, and whether "there were individual pressures applied by some of the jurors to others." Dissent at 50. But the dissent does not cite anything in the record indicating prejudice to May from any such interactions.

advantage to continuing with the existing jury. It was therefore also reasonable for Thompson to refrain from initiating an investigation that could have caused that jury to be dismissed for good. Put simply, it was a strategic choice to not sacrifice the benefits of proceeding with the existing jury in pursuit of more information. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." (emphasis added)).[16]

In sum, on the facts of this case, a mistrial was not plainly more advantageous than continuing with the current jury, such that a lawyer who failed to object should be found ineffective. It was reasonable to conclude that May's best interest was served by continuing with the current jury— which had indicated that at least one of its members was inclined to acquit, had received an instruction prohibiting it from considering certain evidence as proof of May's sexual propensity, and had been presented with the State's relatively weak case-in-chief.[17]

---

[16] The dissent also argues that Thompson could have performed research into caselaw about discharged juries not being able to be reconstituted. Dissent at 46. But the Arizona Court of Appeals held that May failed to raise his claim "that counsel was ineffective for failing to raise a jurisdictional challenge to the continued deliberations," and the dissent does not explain how May has shown cause and prejudice such that we could consider this issue. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

[17] May argues in his briefing that "[t]here is a difference between deciding whether to seek a mistrial and taking the radical, and highly unusual, step of reconstituting the jury to allow previously discharged jurors to begin their deliberations anew." We agree that the particular situation counsel faced was unusual. But May does not explain how that

Even if Thompson may not have made the best decision or the one that most defense lawyers would make, the Sixth Amendment requires no more than objectively competent performance. Under that standard, we are compelled to conclude that Thompson's performance was not constitutionally deficient.

## III.

For the foregoing reasons, we reject May's claim for habeas relief based on Thompson's failure to object to the resumption of jury deliberations. Because, in a concurrently filed memorandum disposition, we also reject May's other arguments for habeas relief, the district court's grant of habeas relief is **REVERSED**.

IKUTA, Circuit Judge, concurring:

It is our duty to impartially follow and apply the law. Here, as required to "reflect our enduring respect for the State's interest in the finality of convictions that have survived direct review within the state court system," *Calderon v. Thompson*, 523 U.S. 538, 555 (1998) (internal quotation marks omitted), we adhered to the limited scope of federal habeas review. In doing so, we uphold the fundamental principles of our legal system. I do not hesitate to concur.

---

would or should alter defense counsel's calculus in weighing the risks of a retrial after mistrial against proceeding with the current jury.

FRIEDLAND, Circuit Judge, concurring:

I write separately to express my dismay at the outcome of this case.

While I certainly recognize the seriousness of child molestation, the evidence that May was actually guilty of the five counts of molestation he was convicted on was very thin. May's conviction on those counts was based almost entirely on the testimony of the children who were the alleged victims. Yet, as described in the opinion, that testimony had many holes. The potential that May was wrongly convicted is especially concerning because he was sentenced to seventy-five years in prison—a term that all but ensures he will be incarcerated for the rest of his life. *See* Ariz. Rev. Stat. Ann. § 13-604.01(G) (2007) (providing that "a person sentenced for a dangerous crime against children in the first degree . . . is not eligible for suspension of sentence, probation, pardon or release from confinement on any basis . . . until the sentence imposed by the court has been served or commuted").

Given the significant constraints on the scope of our review, we are not in a position to do more than decide the narrow question whether the proceedings in this case were so egregiously unfair that they violated the Constitution. But I agree with the dissent that this case, and in particular May's sentence, reflects poorly on our legal system.

BLOCK, Senior District Judge, Dissenting:

The majority holds that "we cannot say that [May's lawyer's] decision to continue with the current jury rather than risking a retrial—which he reached after briefly consulting with May about the choice—fell outside 'the wide range of reasonable professional assistance'" under the constraints of *Strickland v. Washington*, 466 U.S. 668 (1984).

In so holding, the majority ignores *Strickland*'s constitutional underpinning that deference is due only "to counsel's *informed* decisions." *Strickland*, 466 U.S. at 681 (emphasis added). The facts of this case unequivocally show that counsel's decision was the antithesis of an informed decision. Therefore, I must dissent.[1]

**I.**

**A.**

I start with the unimpeachable official trial transcript. It tells us that at 2:58 p.m. on Friday, July 12, 2007, the jury rendered a note, after deliberating for two days, reporting that "we are a hung jury because the not guilty side doesn't believe there is enough evidence and the guilty side believes

---

[1] The panel majority decides this case after taking the extraordinary step of granting Appellee's motion for rehearing. Rehearing is reserved only for cases in which "[a] material point of fact or law was overlooked" or a "change in the law occurred after the case was submitted [and] which appears to have been overlooked" by the court's initial decision. *Adamson v. Port of Bellingham*, 907 F.3d 1122, 1136 (9th Cir. 2018) (citing FRCP 40 and 9th Cir. Rule 40-1). Rehearing is not appropriate "merely to reargue the case." *Id.* The initial majority decision, from March 2019, held that May was entitled to habeas relief. I believed that decision was correct then, and I believe it is correct now.

there is." The court then gave the jury the Arizona-equivalent of an *Allen* charge and recessed from 3:00 until 3:26 p.m., when it received a second note, filed at 3:30 p.m., of the same import, but adding: "We do not have significant dispute over the facts or the elements of law, or how to apply the law to the facts. We feel we need some guidance to 'proof beyond reasonable doubt.'"

The following then transpired:

> THE COURT: Let's bring in the jury.
>
> (Jury enters the courtroom.)
>
> THE COURT: Please be seated. The record will show the presence of the jury, counsel and the defendant.
>
> Ladies and gentlemen, I have received your most recent note and based upon the information contained in that note after discussing it with the attorneys, I'm going to declare a mistrial. I know you are disappointed not to be able to reach a verdict, but sometimes that happens. Some cases are more difficult to resolve than others.
>
> On behalf of the members of the participants in this trial, I want to thank you for your service to the community. You have gone above and beyond what we typically ask jurors to do and most grateful for your time and attention. The attorneys indicated that they may wish to speak with you. You are certainly under no obligation to do so. If you are willing to speak with the lawyers, I would

ask that you wait back in the jury room and they will be in shortly.

Again, thank you very much for your time and attention. You are excused. Have a good weekend.

After the jury exited, the court set the case down for retrial on April 2, 2008 (just about eight months later) and advised the defendant—who was at liberty—that he had to be back in court on that date. It did not impose any additional terms and conditions of release and wished everyone "a good weekend."

The following colloquy then occurred after an unexplained "Off the record" notation:

THE COURT: Well, we're back on the record. The bailiff has received a communication from the jury that they do not wish to have a hung jury and wish to continue deliberating and communicate that to the counsel.

Any objection from the State?

MR. BEATTY: Not from the State.

THE COURT: Any objection [from May's counsel], Mr. Thompson?

MR. THOMPSON: No, your Honor.

THE COURT: All right. I'm going to then advise the bailiff to communicate with the

jury that they may continue deliberating and
to let us know.

The record reflects that "Recess [was] taken at
3:32 p.m." Thus, six minutes had transpired from the time
the jury was discharged until the bailiff was instructed to
advise the jurors that they could "continue deliberating."

What transpired during that brief interregnum after the
jurors were discharged—where they each were, and what
they were doing or saying—is unknown from the trial
transcript. Moreover, it is not known what the bailiff may
have said to the jurors once they were discharged, or what
the bailiff may have said to the jurors when instructing them
that they could continue with their deliberations. Nor is
there any information as to what had transpired or how much
time elapsed "Off the record."

What is known, however, is that the court used the bailiff
as its surrogate to give instructions to the jury rather than to
call the jurors back into the courtroom and that, tellingly,
May's counsel's response when asked if he had any
objection to continued deliberations was instantaneous.
What is perfectly clear from the trial record, therefore, is that
Thompson never asked the court to give him any time to
think about this most critical decision or even to speak to his
client.[2]

---

[2] If Thompson had asked for a pause, or for the opportunity to speak
to his client, the record surely would have reflected as much. *See, e.g.*,
Trial Tr. at 35 (Jan. 10, 2007) (reflecting Thompson's request to "have a
minute" to check on an exhibit); Trial Tr. at 87–88 (Jan. 4, 2007)
(reflecting Thompson's request to "approach" the bench); Trial Tr. at 65
(Jan. 3, 2007) (reporting that a discussion was held off the record
between "state and witness' husband").

The majority's conclusion that May's counsel briefly consulted with him before agreeing to the continued deliberations, consequently, is not supported by the trial transcript; rather, it comes from the post-conviction relief ("PCR") hearing on September 7, 2011—over four years after the trial.  The record of that hearing consists of Thompson's testimony; his Declaration sworn to March 23, 2010; May's Affidavit sworn to February 22, 2010; the testimony of a *Strickland* expert; and the unchallenged transcript of a post-trial investigative interview of one of the jurors.

From all of that, the majority acknowledges simply that "May hired a defense strategy expert, who testified . . . that he believed Thompson was ineffective," and reports only the following snippet from the PCR record—taken from Thompson's Declaration: "[B]efore responding that the defense had no objection to the jury's resuming deliberation, he had 'a very brief conversation' with May about the alternative strategies of continuing with the jury or risking a retrial," and "further stated that he was 'caught in the moment by a circumstance [he] had never before encountered in almost 300 previous felony jury trial [sic].'"[3]

But in cherry-picking from the record, the majority chose not to report other relevant portions of the record.

1.  Thompson testified that his "brief conversation" with May lasted about 20 to 30 seconds, and as explained in his Declaration, centered on the issue of "go[ing] through

---

[3] Thompson presumably got carried away with himself by claiming that he had "almost 300 previous felony trials."  Since Thompson was admitted to the Arizona bar in 1975, he would have had to average approximately 10 felony trials per year to reach 300 by the time of May's trial 32 years later.

another complete trial with the prosecution then in possession of a complete transcript of his testimony from the mistried case." In other words, during those seconds, there was no mention of any of the concerns that the majority meticulously details about the supposed weaknesses of the prosecution's case.

2. Thompson's Declaration explains that when the bailiff returned to the courtroom after the jury had been discharged, the bailiff "whispered" to the judge. Presumably, the bailiff told the judge that the jury had told him that it wanted to continue deliberating. Thompson confirmed that nothing was in writing. As he explained: "I do not recall being aware of any written communication on this subject from the jury to the judge or from the judge back to the jury, nor do I recall being given the opportunity to see any note from the jury to the judge or having any discussion of any written response being sent back to the jury."

3. Thompson's Declaration states that "[a]t the moment Judge Stephens informed the courtroom of the jury's desire to continue deliberating, [he] was standing at counsel table, where Mr. May was sitting." Apparently, this is when Thompson had that "brief" conversation with May, although the official trial transcript makes no mention of what had then transpired aside from Thompson's instantaneous response that he had no objection to the continued deliberations.

4. Although the majority accurately reports that Thompson was "[c]aught in the moment," it fails to mention that Thompson then acknowledged that he "did not consider what had caused the jury to change their minds, whether we should inquire as to what had happened, or whether the jury—having been discharged and released from their oath and admonitions—could even be reconstituted." In other

words, Thompson was the veritable "deer in the headlights" and, other than his awareness that the trial transcript would obviously be available at a retrial, he gave no thought whatsoever to the wisdom of allowing the jury to engage in further deliberations after it had been discharged.

5. May's Affidavit stated:

> The judge then suddenly said that the jury wanted to keep deliberating. After the judge said that, Mr. Thompson and I conferred at the counsel table for a very short time, no more than twenty seconds, before he informed the court that he did not object to the jury continuing deliberations. Mr. Thompson did not discuss with me any of the legal issues underlying this decision, nor did he discuss with me the risks and possible consequences of this decision.

6. At the post-conviction hearing, May's *Strickland* expert explained the prevailing professional norm:

> [W]hen you get a mistrial . . . you close up your file and get out of the courtroom as fast as you can. . . . [B]y all defense standards, you have won not with an acquittal, but you leave with your client . . . to live and fight another day.

The expert then testified that:

> [M]inimal standards require that if you were going to even consider that option of continuing on, to get the information, to find out what went on so you can analyze the

information and, importantly, advise your client of all the risks and rewards and what, given your recommendation, and come to a collective decision as to what's the best course to follow.

Here, a decision was made without the benefit of information. It was a decision to continue on, . . . all your nerve endings are telling you not to and you don't have sufficient information and . . . you have a jury that has sat outside the courtroom, who had been released doing who knows what went on there, and you are making a decision to carry on with insufficient information.

The expert then opined on what the "reasonable objective standards would require":

Well, what reasonable objective standards would require is that, one, first you gather whatever information is available about what just went on, either through the bailiff advising on the record, the Court advising on the record so you have the information— whatever information is available you have. It might even require a voir dire of certain members of the jury, and then after you gather the information, you take whatever time is necessary and you ask the Court's indulgence . . . to explain to your client what just happened, here are the pros, here are the cons, here's my recommendation to you, here's the risks, here's the rewards, and then

you and the client come to a collective decision.[4]

7.  Finally, the transcript of the unchallenged interview with one of the jurors conducted by the post-conviction investigator disclosed what had transpired as soon as the jurors returned to the jury room after they were discharged:

> Ruggiero:  Last question.  When you guys were back in the jury room between the time the mistrial was declared and the time you came back, did anyone make any phone calls, get on their cell phones?
>
> Proeber:  Absolutely every one of us.
>
> Ruggiero:  Did you call out?
>
> Proeber:  I'm sure I did.
>
> Ruggiero:  Who did you call?
>
> Proeber:  I don't remember.

---

[4] The majority states that the *Strickland* expert "recognize[d] that there could be 'pros' and 'cons' to" to resumed jury deliberations. However, reading his testimony in context, the expert was *not* "recogniz[ing]" any "pros" of allowing a discharged jury to resume deliberations.  To the contrary, his testimony outlined the bare minimum of what defense counsel should do when the possibility of reconvening a discharged jury arose—such as investigate possible juror contamination—and the myriad ways in which Thompson failed to satisfy "reasonable objective standards" by blithely acquiescing to resumed deliberations.

Ruggiero:  Did you talk about the trial?

Proeber:   My friend, something, saying oh
my God it's over.

Ruggiero:  Did you–

Proeber:   Thank God I'm coming back to
work now.  I mean, I'm sure.

Ruggiero: Did others make calls?

Proeber:   Every one of us was on our cell
phones walking out.

## B.

Because the majority holds against May on the
deficiency prong, I analyze that prong first.  Although the
majority concluded that it "need not decide which standard
of review applies," it is clear to me that it is *de novo.*  Under
AEDPA, if a state court's last-reasoned decision addressed
the merits of an issue, then habeas relief is only available if
that decision was "contrary to, or involved an unreasonable
application of, clearly established Federal law, as
determined by the Supreme Court of the United States" or
"was based on an unreasonable determination of the facts in
light of the evidence presented in the State court
proceeding."  28 U.S.C. § 2254(d).  However, where "the
state court has not decided an issue, we review that question
*de novo.*"  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th
Cir. 2006).

Here, the last reasoned state court decision was the
Arizona Court of Appeals' affirmance of the denial of PCR.

That decision held only that May was not prejudiced by his counsel's performance; therefore, it did not resolve the issue of whether Thompson's performance was objectively deficient. Accordingly, *de novo* review of *Strickland*'s deficiency prong is the proper standard of review. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."). That standard calls upon us to perform an independent review of the record before the Arizona Court of Appeals. *See Reynoso*, 462 F.3d at 1109 ("[When] no reasoned state court decision denying a habeas petition exists, this court must . . . perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." (internal citation omitted)); *see also Rabkin v. Oregon Health Scis. Univ.*, 350 F.3d 967, 970 (9th Cir. 2003) ("When *de novo* review is compelled, no form of appellate deference is acceptable." (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991))).

As identified in Part I.A., *supra*, the relevant record includes the trial transcript, the PCR hearing transcript, Thompson's Declaration, May's Affidavit, and the juror interview.

## C.

The majority has devoted its entire opinion to a detailed analysis of the trial testimony and evidence, yet that is beside the point unless we were to hold that counsel's mindless acquiescence to resumed deliberations was an irrelevancy.

But that is not the law, and there is no Supreme Court support for such a novel notion. Rather, *Strickland* requires that counsel make "*informed* strategic choices"—often requiring a "thorough investigation of law and facts."

*Strickland*, 466 U.S. at 690–91 (emphasis added). Thompson's blind acquiescence to continued deliberations was anything but an informed decision. At the very least he had an obligation to put some thought into his thoughtless decision.

He also had an obligation "to consult with the defendant on important decisions." *Strickland*, 466 U.S. at 688. Certainly, this was an important decision.[5] At best, the record reflects a 20- to 30-second conversation between counsel and client where apparently all that was mentioned was the obvious—that the trial transcript would be available at a retrial. This is hardly a meaningful consultation. *See, e.g.*, *U.S. ex rel. Washington v. Maroney*, 428 F.2d 10, 12–13 (3rd Cir. 1970) (commenting on an ineffective conference between counsel and defendant that lasted between one to ten minutes: "This brief encounter between Washington and counsel took place in open court . . . . It was in no respect a private discussion, but was a hurried, whispered meeting in an atmosphere where a genuine opportunity for disclosure of information or a discussion of defense was impossible."). Nor could it be a meaningful conversation if Thompson had not acquired basic facts and had not taken a modicum of time to explore the law. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his *failure to perform basic research* on that point is a quintessential example of

---

[5] To be sure, a lawyer has no duty to consult with his client during the course of a trial before moving for a mistrial. *See United States v. Chapman*, 593 F.3d 365, 367–68 (4th Cir. 2010) (citing cases). But allowing a jury to deliberate *after* a mistrial has been declared is a far different issue, and is obviously an "important," if not critical, decision.

unreasonable performance under *Strickland*." (emphasis added)).

Given the uniqueness of this case—which Thompson acknowledged he had never before encountered in his many years of representing criminal defendants in felony trials—any reasonable lawyer would have asked the court for some opportunity to investigate the facts and law. There was simply no rush to judgment. It was late Friday afternoon. The court could simply have instructed the jurors to return after the weekend and admonish them not to discuss the case with anyone. Thompson should at least have asked for the opportunity to check out the law over the weekend and to reflect on what had transpired during the course of the trial. It would also have given him time to think about what additional facts should be ascertained before he could make an informed decision and effectively consult with May.

If Thompson had investigated the law and facts, here's what he would have found:

1. *The Law & Prevailing Professional Norm*

The Supreme Court instructs that the first prong of the *Strickland* standard, "constitutional deficiency—is necessarily linked to the practice and expectations of the legal community." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010). Thus, "[t]he proper measure of attorney performance remains simply reasonableness *under prevailing professional norms.*" *Id.* (emphasis added) (quoting *Strickland*, 466 U.S. at 688).[6]

---

[6] Consequently, in *Padilla* the Supreme Court held that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* at 367.

Prevailing professional norms are, therefore, valuable "guides to determining what is reasonable." *Strickland*, 466 U.S. at 688. As acknowledged in our Memorandum, the "'prevailing professional practice at the time of the trial,'" *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam), "provide[s] the background" for assessing Thompson's performance. Thompson should have thought about what the prevailing professional norm was when the opportunity for a mistrial was extant.

Authorities teaching that defendants benefit when hung juries result in mistrials are legion. Such authorities vary in time and format and abound in criminal defense manuals, reported cases, and legislative debates from across the country. *See, e.g.*, Blue's Guide to Jury Selection § 28:5; Criminal Trial Techniques § 66:11 ("Even where the case is perceived to be progressing well for the defense, the potential waiver of an applicable issue by the failure to seek a mistrial almost always warrants the motion."); Massachusetts Superior Court Criminal Practice Manual, ch. 18, CRIMP MA-CLE 18-1 ("Defense counsel who oppose mistrial [when a jury is deadlocked] should have very strong reasons to hope for acquittal; the wiser course usually is to seek the mistrial and return to fight another day.").[7]

---

[7] *See also People v. Rundle*, 180 P.3d 224, 304 (Cal. 2008) (characterizing a mistrial ruling as "a more favorable outcome"), *rev'd on other grounds*, *People v. Doolin*, 198 P.3d 11 (Cal. 2009); *State v. Taylor*, 142 P.3d 1093, 1098 (Or. Ct. App. 2006) (quoting a colloquy between a trial judge and a defendant in which the judge describes "a hung jury on" a "felony count was a pretty good result"); 1 Proceedings and Debates of the Constitutional Conventions of the State of Ohio 180 (1912) (statement of Humphrey Jones) ("Two things are always kept in view. One is to get a jury to acquit, and if you can't do that the next best

This common understanding is not simply the product of arbitrary tradition; a mistrial is favored for many concrete reasons. For example, the Second Circuit has cited an empirical study finding that "the last vote of deadlocked juries favors conviction nearly three times as often as acquittal." *Lane v. Lord*, 815 F.2d 876, 879 (2d Cir. 1987). Thus, if an opportunity for a mistrial is available when there is a hung jury, a defense attorney would generally be well-advised to take it.

Apart from that, a mistrial means more time for negotiations, potential witness unavailability, new evidence, and so forth. *See, e.g.*, *United States v. Diggs*, 522 F.2d 1310, 1321 n.24 (D.C. Cir. 1975) ("[A] mistrial need not 'require' a retrial. Witnesses disappear; other considerations often affect the prosecutor's discretion."); *see also* Richard A. Primus, *When Democracy Is Not Self-Government: Toward a Defense of the Unanimity Rule for Criminal Juries*, 18 Cardozo L. Rev. 1417, 1417 n.2 (1997) (explaining that trials ending in hung juries are beneficial for criminal defendants in part because not every hung jury results in a retrial). In May's case, a mistrial also meant guaranteed time out of jail, since he was out on bond.

In other words, well-known defense strategies clearly supported preserving a mistrial here. Thus, Thompson

---

thing is to get one that will fail to agree. And it is a matter of common knowledge that every means is adopted that is available within the limits of the ethics of the profession to secure at least a jury that will not convict."); *id.* (statement of James C. Tallman) ("[T]he prosecution adopts all means it can to secure a conviction, but the prosecution does not want a hung jury. A hung jury doesn't do the prosecution any good.").

should have at least considered that the prevailing professional norm would counsel against rejecting a mistrial.

Moreover, in addition to being cognizant of the prevailing professional norm, some simple research would have informed Thompson that there was caselaw applying the then-prevailing common law rule that once a jury has been discharged it could not be reconstituted. *See, e.g.*, *Blevins v. Indiana.* 591 N.E.2d 562, 563 (Ind. App. 1992) ("Any action of the jury after its discharge is null and void."); *Michigan v. Rushin*, 194 N.W.2d 718, 721–22 (Mich. App. 1971) (error to reconvene jury after it had left the courtroom, "be it for two minutes or two days"); *Tennessee v. Green*, 995 S.W.2d 591, 614 (Tenn. 1998) (convictions vacated; jury may not be reconvened if it has been discharged and "outside contacts may have occurred") (internal quotation and citation omitted); *Melton v. Virginia*, 111 S.E. 291, 294 (Va. 1922) (reversing conviction: "[i]t is sufficient that the jury had left the presence of the court").[8]

Justice Thomas has explained the rationale for this "prophylactic rule"—which was applicable to both civil and criminal cases:

> Even without full sequestration, the common-law rule remains sensible and administrable. After discharge, the court has no power to impose restrictions on jurors, and jurors are no longer under oath to obey them. Jurors may access their cellphones and get

---

[8] Generally, these criminal cases have involved juries that were discharged after rendering a verdict. However, *Blevins* considered the specific factual circumstance of a jury discharged after the declaration of a mistrial, as in May's trial. 591 N.E.2d at 563.

public information about the case.  They may talk to counsel or the parties.  They may overhear comments in the hallway as they leave the courtroom.  And they may reflect on the case—away from the pressure of the jury room—in a way that could induce them to change their minds.  The resulting prejudice can be hard to detect.  And a litigant who suddenly finds himself on the losing end of a materially different verdict may be left to wonder what may have happened in the interval between the jury's discharge and its new verdict.  Granting a new trial may be inconvenient, but at least litigants and the public will be more confident that the verdict was not contaminated by improper influence after the trial has ended.  And under this bright-line rule, district courts would take greater care in discharging the jury.

*Dietz v. Bouldin*, 136 S.Ct. 1885, 1898 (2016) (dissenting opinion).

## 2. *The Facts*

Although not embracing the common-law rule in *Dietz*, the Supreme Court's majority opinion serves as a template for the common-sense facts that Thompson should have considered.  There, the Court announced that trial courts have an inherent power to rescind a discharge order in civil cases.  It cautioned, however, that the power "must be carefully circumscribed, especially in light of the guarantee of an impartial jury that is vital to the fair administration of justice."  *Dietz*, 138 S.Ct. at 1893.  Therefore, it held that "[a]ny suggestion of prejudice in recalling a discharged jury

should counsel a district court not to exercise its inherent power." *Id.* at 1894. Thus, "for example," an inquiry should be made as to "whether any juror has been directly tainted." *Id*.

The Court explained that a trial court "should also take into account at least the following additional factors that can indirectly create prejudice in this context, any of which standing alone could be dispositive in a particular case." *Id.*

"First, the length of delay between discharge and recall." The Court imposed no bright-line rule, but commented that the delay "could be as short *as even a few minutes*, depending on the case." *Id.* (emphasis added.).

"Second, whether the jurors have spoken to anyone about the case after discharge." The Court explained that "[e]ven apparently innocuous comments about the case *from someone like a courtroom deputy s*uch as 'job well done' may be sufficient to taint a discharged juror who might then resist reconsidering her decision." *Id.* (emphasis added).

"Third, the reaction to the verdict." As examples, the Court stated that "[s]hock, gasps, crying, cheers, and yelling are common reactions to a jury verdict—whether as a verdict is announced in the courtroom or seen in the corridors after discharge."

Tellingly, the Court then concluded:

> In considering these and any other relevant factors, *courts should also ask to what extent just-dismissed jurors accessed their smartphones* or the internet, which provide other avenues for potential prejudice. It is a now-ingrained instinct to check our phones

> whenever possible. Immediately after discharge, a juror could text something about the case to a spouse, research an aspect of the evidence on Google, or read reactions to a verdict on Twitter. *Prejudice can come through a whisper or a byte.*

*Id.* at 1895 (emphases added).

Finally, the Court "caution[ed] that our recognition here of a court's inherent power to recall a jury is limited to civil cases only" and did not address, therefore, "whether it would be appropriate to recall a jury after discharge in a criminal case."[9]

## D.

I have made my own full independent review of the entire record before the Arizona Court of Appeals and cannot conclude that it reflects that Thompson made an "informed" decision to allow the jury to continue to deliberate after it had been discharged. It is painfully clear that the opposite was the case. And it is also painfully clear that Thompson could not have effectively counseled his client—let alone in 20 to 30 seconds—without first

---

[9] While the Supreme Court may someday take up the issue, it will not be able to do so in this case since May's counsel has never preserved the issue as one invoking federal constitutional law. *Picard v. Connor*, 404 U.S. 270, 275 (1971) (holding that to preserve federal claim for habeas review, "the federal claim must be fairly presented to the state courts"); *Madrid v. Gregoire*, 187 F.3d 648 (9th Cir. 1999) ("Absent the requisite specificity of a federal claim, [petitioner] did not preserve his claim for federal habeas review.").

ascertaining what may have occurred after the jury was discharged.

Indeed, a number of questions jump off the pages: (1) What were the precise communications between the bailiff and the jurors both before and after the judge discharged the jurors?  In particular, what instructions did the bailiff give the jurors as the judge's surrogate? (2) Was there any communication in the hallway between some of the jurors—let alone with the bailiff—before they all returned to the jury room? (3) Were there individual pressures applied by some of the jurors to others outside the jury room to continue deliberations? (4) Since the record contains the unchallenged report from one juror that "everyone was on our cellphones walking out," to whom were the jurors talking, and what was said?

I have profound respect for the candor expressed by my colleague in her concurring opinion, and for her humanity in recognizing that "[t]he potential that May was wrongly convicted is especially concerning because he was sentenced to seventy-five years in prison—a term that all but ensures he will be incarcerated for the rest of his life,"[10] and that his

---

[10] Unlike New York, the federal system has yet to embrace the concept that "principles of justice" can, *and should*, transcend common or codified law.  *See* N.Y. Crim. Proc. Law § 210.40 (conferring authority on courts to dismiss indictments, or counts thereof, "as a matter of judicial discretion" where a "compelling factor, consideration or circumstance clearly demonstrate[s] that conviction or prosecution . . . would constitute or result in injustice"); *People v. Clayton*, 342 N.Y.S.2d 106, 109 (N.Y. App. Div. 2d 1973) (finding the use of § 210.40 "depended only on principles of justice, not on the legal or factual merits of the charge or even on the guilt or innocence of the defendant"); Frederic Block, *The Clayton Hearing*, N.Y. State B.J., Oct. 1973, at 412 (commenting that *Clayton* and § 210.40 "set in motion new machinery

sentence "reflects poorly on our legal system."[11]   But I cannot agree with her that there were "significant constraints on the scope of our review."  The majority simply limited its review to an extensive analysis of those parts of the record that apparently played a large part in the jurors' inability to reach a verdict before the mistrial was declared.  But May's counsel never indicated that he had reflected for one moment about the weaknesses of the prosecution's case—let alone discussed them with his client.

The majority has not made a full independent review of Thompson's performance—which is the true "scope of our review."  If it did, it could not conclude that his mindless assent to continued deliberations was truly an informed decision.

---

to allow for the screening of criminal cases . . . for reasons transcending the defendant's guilt or innocence").

[11] Judge Friedland might also have noted that it also reflects "poorly on our legal system" that Arizona is the only state that places the burden of proving lack of intent on the defendant, and that it may well be that if the issue ever reached the Supreme Court, it would agree with Judge Wake that it is unconstitutional.  *See May v. Ryan*, 245 F. Supp. 3d 1145, 1149 (D. Ariz. 2017) ("Arizona stands alone among all United States jurisdictions in allocating the burden of proof this way."); *Schad v. Arizona*, 501 U.S. 624, 640 (1991) ("[A] freakish definition of the elements of a crime that finds no analogue in history or in the criminal law of other jurisdictions" may signal constitutional infirmity.).  However, as explained in our Memorandum, Thompson could not be faulted for failing to object on that ground.

**II.**

A.

Although not critical to the dispositive conclusion that Thompson's performance was objectively deficient because of his failure to make an informed decision—which also prevented him from effectively consulting with his client—I also take issue with the majority's conclusion that "[t]here were good reasons to think that sticking with the current trial record and jury would better serve May's interests than would a new trial." While the majority has finely combed the record in its effort to support its conclusion, its principal rationales are that May's counsel could have reasonably wanted to avoid a second trial because (1) "the State would be able to refine in other ways the case it presented at the first trial," and (2) a less favorable jury instruction might have been given at a second trial. Against the available evidence, these conclusions are subjective, speculative, and unsupportable.

The first rationale simply makes no sense. It would render nugatory the entire body of law extolling the virtues of a mistrial since the record of any prior trial would always be available to the government at a retrial. In any event, I see nothing in the record explaining what the State could have meaningfully done better if it got a second bite at the apple. The State makes several arguments, which the majority presumably credits. For example, at oral argument the State argued that May's demonstrably false statements that he did not know one of the victims, or even "half a dozen children," were particularly damaging to his defense and would have been used against him in a second trial. Yet those statements were made in a pretrial police interview and had been admitted in the first trial. They would not be more damaging in some future proceeding. In addition, May had

vigorously proclaimed his innocence at trial, and it is unclear what benefit the State could have derived from having a copy of that testimony.  In short, the majority's conclusory argument that the State could have refined its case at a second trial rings hollow.[12]

The remaining rationale stands on no better footing. Having consolidated seven of the eight counts, the trial judge instructed the jurors that they could collectively consider them under Arizona Rule of Evidence 404(b) to establish, *inter alia*, intent, which was the what the trial was all about. She pointedly told the jury not to consider the seven counts as evidence of propensity.  It is pure speculation to surmise that the judge would change her mind and give a propensity instruction at a second trial.  Moreover, given the powerful collective impact of the 404(b) charge, it is unrealistic—and, once again, purely speculative—to surmise that a propensity charge would have made a defining difference.

## B.

To allow all this speculation by two of the three judges on this particular panel to trump the body of law supporting a retrial, especially in light of the prevailing professional norm and the unimpeached expert testimony, would be a miscarriage of justice.

Notably, the majority ignores that prevailing professional norms are valuable guides to determining what is reasonable; and since *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not

---

[12] Of course, a retrial also affords the defense the opportunity to refine its case.  Thus, an acquittal following a retrial is entirely possible and does indeed occur.  *See, e.g.*, Frederic Block, *Crimes and Punishments: Entering the Mind of a Sentencing Judge* ch. 2 (2019).

counsel's subjective state of mind," a reviewing court must identify the prevailing professional norm *before* it decides whether a potential justification for counsel's performance is objectively reasonable. *Harrington v. Richter*, 562 U.S. 86, 105, 110 (2011) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms.'"). Otherwise, there is no anchor to guard against decisions pegged on the predilections of judges.

Justice Cardozo famously taught that judges are "not to innovate at pleasure. [A judge] is not a knight-errant roaming at will in pursuit of his own ideal of beauty or goodness. He is to draw his inspiration from consecrated principles." Benjamin N. Cardozo, The Nature of the Judicial Process 141 (17th prtg. 1957) (1921). In more recent times, jurists across the political spectrum have cautioned against judges relying on their own personal judgment, hunches, or preferences over concrete evidence. *See, e.g.*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (plurality opinion of Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ.) ("After all, judges are most likely to come to divergent conclusions when they are least likely to know what they are doing."); *Roper v. Simmons*, 543 U.S. 551, 616 (2005) (Scalia, J., dissenting) ("By what conceivable warrant can nine lawyers presume to be the authoritative conscience of the Nation?"). Objective evidence is the antidote to the vagaries of a random panel-selection process that draws from a pool of judges who may not even have had first-hand experience with the criminal justice system.

The majority also fails to credit the testimony of the *Strickland* expert, who testified to the standards to which defense attorneys are held—precisely the "prevailing

professional norm" against which *Strickland* directs us to measure counsel's performance. The *Strickland* expert testified that, with a mistrial, "by all defense standards, you have won[,] not with an acquittal, but you leave with your client to go out with you, to live and fight another day." *Strickland* expert testimony is routinely accepted as reliable evidence of pertinent professional norms. *See, e.g.*, *Hamilton v. Ayers*, 583 F.3d 1100, 1130 (9th Cir. 2009) ("The district court clearly erred in relying on the testimony of Hamilton's trial counsel as to the 'standard capital practice' at the time of trail and rejecting the testimony of Hamilton's *Strickland* expert.").

Thus, these failings—apart from the failure to make an informed decision—also compel the conclusion that Thompson's performance was objectively deficient under the first prong of *Strickland.*

## III.

Since I would find in May's favor on objective deficiency grounds, I must also analyze prejudice. Because the state PCR court resolved the prejudice issue "on the merits," I review that decision under AEDPA's "contrary to, or an unreasonable application of clearly established law" standard. I conclude that the Arizona Court of Appeals decision as to the prejudice prong of May's ineffective-assistance claim was "contrary to" clearly established law as dictated by *Strickland*, and I would find that May is entitled to habeas relief.

The Arizona Court of Appeals denied May's claim on the ground that "May [could not] show prejudice because [the court] rejected the underlying claim of error on [direct] appeal." *State v. May*, 2012 WL 3877855, at *4 (Sept. 7, 2012). On direct appeal, the Court of Appeals considered

whether the trial court committed *fundamental error* "by allowing the jury to reconvene." *State v. May*, No. 1 CA-CR 07-0144, 2008 WL 2917111, at *2–3 (Ariz. Ct. App. July 24, 2008). Arizona courts define "fundamental error" as any "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State v. Henderson*, 115 P.3d 601, 607 (Ariz. 2005) (quoting *State v. Hunter*, 688 P.2d 980, 982 (1984)). Of course, the standard for prejudice under *Strickland* is different; requiring only that a petitioner establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

Asking whether it constitutes fundamental error to "allow[] the jury to reconvene" (as the Court of Appeals did on direct review) is different than asking whether there was a "reasonable probability" that the trial judge would have sustained an objection to resumed deliberations *if* one had been made (which was the question posed to the Court of Appeals in the PCR proceeding). *Cf. United States v. Schaflander*, 743 F.2d 714, 719 (9th Cir. 1984) (assessing prejudice based upon "[w]hether the trial court would have sustained the objection"). When the PCR court relied on the direct-review decision to hold that May had not shown prejudice, it committed a non sequitur: That May had not shown prejudice under a "fundamental error" standard did not mean that he failed to show prejudice under *Strickland*.[13]

---

[13] This distinction is also clear in light of the procedural history in the state courts. Appellate counsel had no choice but to argue fundamental error since trial counsel failed to object and appellate counsel was not allowed to argue ineffective assistance of trial counsel.

By incorporating a fundamental error standard in its decision, the state court rendered a judgment "that was contrary to . . . clearly established Federal law, as determined by the Supreme Court" in *Strickland*. 28 U.S.C. § 2254. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000) (plurality opinion of O'Connor, J., joined by Rehnquist, C.J., and Kennedy, Thomas, and Scalia, JJ.) ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.").

Moreover, under a correct application of *Strickland*, there can be no doubt that Thompson's deficient performance prejudiced May. *Cf. Williams*, 529 U.S. at 396 (plurality opinion of Stevens, J., joined by O'Connor, Kennedy, Souter, Ginsburg, and Breyer, JJ.) (applying *Strickland* to ineffective-assistance claim after holding state-court decision was "contrary to" clearly established law). By the time the jury resumed deliberations, the trial judge had declared a mistrial, discharged the jury, and set a new trial date. The trial also was of relatively short duration. Given those considerations, there was "a reasonable probability" that if trial counsel had objected to reconstituting the jury, the trial judge would have sustained the objection and maintained the mistrial. *Strickland*, 466 U.S. at 694. Indeed, the trial judge might well have granted such an objection simply to prevent the possibility or perception of juror contamination, or out of a concern that a decision to allow

---

*See State ex rel. Thomas v. Rayes*, 153 P.3d 1040, 1044 (Ariz. 2007). Thus, on direct review, the Court of Appeals could *only* analyze the waived objection to resumed deliberations for fundamental error. On collateral review, May is able to argue ineffective assistance of trail counsel, and May's point is that the objection would have been analyzed by the trial court on a clean slate. That is clearly a different inquiry than fundamental error.

resumed deliberations would be erroneous (even if such error did not rise to the heights of a "fundamental error"). Under *Strickland*, no more is needed to show prejudice.

## CONCLUSION

Because I would find that May's counsel was objectively deficient in not objecting to resumed jury deliberations, and because there was a reasonable probability that an objection would have been sustained, I would affirm the grant of *habeas* relief.[14] Regrettably, the majority returns a man to prison—probably for the rest of his life—under the severe strictures of Arizona's sentencing regime.[15]   May has already served ten years based on his counsel's ineffectiveness, and has been at liberty since March 2017,

---

[14] In our Memorandum, we rejected May's argument that his counsel was ineffective for failing to consult with him because May has not shown *prejudice*.  However, the failure to effectively consult with May was a component of Thompson's objectively deficient *performance*, and the prejudice prong is otherwise satisfied.

[15] Although May has raised a claim that the Eighth Amendment rendered his harsh sentence unconstitutional, I concurred with the majority in our Memorandum that the claim was procedurally barred.  In any event, the Supreme Court has foreclosed that argument.  *See Ewing v. California*, 538 U.S. 11, 30–31 (2003).  While I am mindful of that precedent and the seriousness of May's offenses, I cannot help but agree with the dissenters in that case, two of whom are still sitting Justices.  A common-sense proportionality review, which would weigh May's criminal conduct against his otherwise clean record and all-but-life sentence, would doubtless suggest that the punishment is cruel and unusual, especially taking into account sentencing patterns in other jurisdictions.  *See id.* at 35 (Breyer, J., dissenting).

without incident, ever since Judge Wake granted his *habeas* petition based on a statute of dubious constitutionality.[16]

---

[16] Judge Wake raised compelling reasons why the statute placing the burden of proving lack of intent on the defendant may well be unconstitutional. However, as explained in our Memorandum, "[g]iven the long-standing Arizona rule that the State is not required to prove sexual intent . . . we cannot conclude that trial counsel's failure to object to the constitutionality of the statute[] . . . 'fell below an objective standard of reasonableness.'" Therefore, any review by the Supreme Court of the statute's constitutionality will have to await another day.